[No. F015023. Fifth Dist. Aug. 13, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM EARL EDWARDS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, IV, V, and VI.

## COUNSEL

David Fuller, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Acting Assistant Attorney General, Roger E. Venturi and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**VARTABEDIAN, J.**—Defendant, William Earl Edwards, was found guilty by jury of two counts of grand theft. (Pen. Code, § 487.) In addition, the jury found that each theft involved more than $25,000. (Pen. Code, § 12022.6.) The trial court denied probation and sentenced defendant to prison on count

I for the middle term of two years plus a one-year consecutive term for the enhancement. Count II was ordered to be served concurrently. Defendant appeals, claiming evidentiary, instructional and sentencing errors. We affirm.

## FACTS

Defendant was the pastor of the Calvary Missionary Baptist Church. In 1989, 79-year-old Otto Reed attended defendant's church. Reed wanted to sell his home for $25,000. Defendant told him he could get more than $25,000 for the property. Defendant wanted to sell the home for Reed, and Reed agreed defendant could keep anything made over $25,000.

Defendant took Reed to a notary public, Martha Davis, on June 6, 1989. Reed signed a grant deed for his property to go to defendant and his wife. Miss Davis asked Reed if he knew what he was doing. Reed said yes, although Miss Davis did not explain the document to Reed. Defendant told Reed he needed to sign the papers to help defendant sell the house. Reed testified he is not able to read.

Earlier, Reed had expressed interest in living at St. John's Manor, a housing unit for low-income senior citizens. In May 1989, Reed received an application from the senior manager of the housing unit. Defendant told Reed it was hard to get into St. John's Manor with the kind of money Reed had. Reed gave defendant $29,000, believing this would make him eligible to reside there. The $29,000 check was deposited into defendant's account, and was credited to that account on May 31, 1989, according to bank records. The agreement between Reed and defendant was that when Reed wanted the money back, defendant would return it.

On June 8, 1989, defendant and Reed went to St. John's Manor for an interview. Reed told the manager he could not read. His application for residence was approved on July 6, 1989. Reed paid monthly rent every month up until January 1, 1990, but he never moved into St. John's Manor. The manager testified that an individual's eligibility is determined by his income and not his assets, except to the extent the assets provide interest.

Defendant helped Reed out by transporting him to various places, and Reed trusted him. Reed believed defendant would return his money when he asked for it. But when Reed asked for the money back, defendant did not give it to him. Reed told William Mosley that he thought he was in trouble with defendant and thought defendant had taken his money. Mosley contacted a local television station about Reed's problems, and the television station contacted the police.

Detective Robert Yoon was assigned to the case. Reed told Detective Yoon that he gave the money to defendant for him to hold onto so Reed could get into St. John's Manor and that defendant was going to help him sell his property. Reed told Detective Yoon he had not received his money back as promised, nor had defendant returned the papers he signed.

Detective Yoon interviewed defendant. Defendant said the money and the property Reed gave him were gifts; Reed made the gifts because he did not want his estate going to the county when he died. Defendant told Detective Yoon that Reed was able to read and understood the paperwork in the transactions. Defendant had spent the money given to him and refused to reimburse Reed.

Reed's eye doctor, Dr. Charles Fritch, testified that Reed is legally blind. He has no vision in his left eye. His visual field in the right eye is quite restricted. For example, at close range, Reed can see only two or three letters at a time. In May of 1989, Reed could probably see large print.

### Defense

Defendant testified on his own behalf. He said Reed asked him to be the beneficiary of his account and his insurance policies. Reed did not want to leave the money in the bank because he did not want his stepdaughter, Rosa, to get it and he wanted to get into St. John's Manor. Defendant suggested that Reed talk to his insurance agent about the handling of his funds. Defendant and Reed consequently talked to Reed's insurance agent, Mr. Wong. Mr. Wong suggested that Reed put his money into an annuity. When defendant and Reed got to the parking lot of the insurance agency, Reed was angry and told defendant he did not want to put his money in an annuity. Defendant told Reed he had to do something with the money. Reed told defendant he wanted to give it to him. When defendant asked why, Reed said he did not want others to have it. At that time, defendant did not agree to take the money but suggested that they confer with another church member. They did, and the church member advised that defendant should take the money. Defendant still did not agree, and told Reed to sleep on it.

The next morning, Reed said he had not changed his mind and wanted to give the money to defendant in cash. Defendant said he would not accept cash, and the transfer had to be done in a business-like fashion; it would have to be deposited in defendant's bank account. Defendant warned that he, his wife and a son use that account, meaning the money would be spent. However, continued defendant, if Reed wanted some of the money, defendant would give it to him, but no more than $3,000 at a time. Defendant wrote

out the $29,000 check and Reed signed it; defendant's bank book showed it was deposited in his account on May 31, 1989.

On June 3, 1989, Reed told defendant he wanted to transfer his residential property to defendant because he did not want Rosa or the county to get it. He wanted defendant to have the property. Defendant told Reed he would not sell the property without Reed's approval, and Reed did not have to move if he did not want to. Defendant and Reed went to the notary and had the property transferred from Reed to defendant and his wife.

Over the next several months, defendant gave Reed money when he asked for it. He gave him over $5,000 altogether. Reed rejected all offers made on his home.

In December of 1989, someone told Reed that defendant was having a good time with his money. Defendant told Reed he was going on vacation. Reed asked for his money and property back. Reed stuck his hand in his pocket, which defendant thought contained a gun. Defendant said he would see how much money was left and would transfer the property back to Reed if Reed had someone to buy it. Defendant did not return to talk with Reed after this. There was no doubt in defendant's mind that both transfers were gifts.

## DISCUSSION

### I.

### *Admission of Statements Made to Detective Yoon\**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### II.

### *Exclusion of Evidence Regarding Defendant's Intent*

On several occasions, defendant gave Reed money from the $29,000 fund. Defendant also made some improvements to Reed's home. After criminal charges were filed, defendant transferred title to the residence back to Reed.

Prior to trial, the People made a motion *in limine* to exclude evidence of restitution or restoration by defendant to Reed. Defendant argued that restitution and restoration bore on the question of whether he had the requisite

---

\*See footnote, *ante*, page 1092.

intent at the time of the taking. Defendant wanted to present to the jury evidence that he gave money to Reed when he asked for it, improved Reed's home, and subsequently transferred title of the home back to Reed. The trial court ruled that the evidence was irrelevant because it did not speak to defendant's state of mind at the time of the taking.

During the prosecution's case-in-chief, defendant argued that his retransfer of ownership of Reed's house to Reed should be admitted to show that defendant was holding the property in trust. The trial court again ruled the evidence should be excluded since the policy is that a thief cannot mitigate his crime by restoring the property after he is charged with its theft.

After the People rested, defendant renewed his motion to admit evidence of the return of some of the money to Reed, improvements to the house, and retransfer of the property, again asserting it bore on the question of intent at the time of the taking. Defendant also argued it could be used as impeachment of Reed's statement that defendant never gave him anything back. The court denied the motion for all purposes except impeachment; it took that portion of the motion under submission.

The trial court discussed the evidence again. While it saw some relevance, particularly to impeach Reed's denial he had received anything from defendant, it expressed concern about policy reasons for excluding the evidence and, again, how subsequent actions bore on defendant's intent at the time of the taking. The court noted the applicability of Penal Code sections 510 through 513 to exclude events subsequent to the taking. The trial court additionally raised the question how the return of anything is consistent with defendant's theory that what he received from Reed were gifts. This question was never answered.

A hearing was held outside the jury's presence. Defendant testified that he gave money back to Reed and spent money to improve the house. The court ruled it would admit evidence of the repayment of the money for the limited purpose of impeaching Reed's testimony to the contrary. Defendant was ordered to not testify as to the repairs he made to Reed's house or the money spent on the repairs to Reed's home.

Before defendant testified regarding giving the money to Reed, the court gave a limiting instruction to the jury telling them the evidence could only be used to determine Reed's credibility.

Defendant argues on appeal that the trial court erred in excluding the evidence. He contends the reconveyance of title, repairs to the house, and the

payment of money to Reed were relevant to his intent at the time the items were acquired. Defendant asserts the error was prejudicial.

Penal Code sections 512 and 513 provide:

"The fact that the accused intended to restore the property embezzled, is no ground of defense or mitigation of punishment, if it has not been restored before an information has been laid before a magistrate, or an indictment found by a grand jury, charging the commission of the offense." (Pen. Code, § 512.)

"Whenever, prior to an information laid before a magistrate, or an indictment found by a grand jury, charging the commission of embezzlement, the person accused voluntarily and actually restores or tenders restoration of the property alleged to have been embezzled, or any part thereof, such fact is not a ground of defense, but it authorizes the court to mitigate punishment, in its discretion." (Pen. Code, § 513.)

■ While it is clear "[r]estoration of property feloniously taken or appropriated is no defense to a charge of theft" (*People* v. *Pond* (1955) 44 Cal.2d 665, 674 [284 P.2d 793]), a defendant has a fundamental right to present a defense and to present all pertinent evidence of significant value to that defense (*Davis* v. *Alaska* (1974) 415 U.S. 308, 317 [39 L.Ed.2d 347, 354, 94 S.Ct. 1105]). ■ In order to prove the crime of theft, it must be shown defendant had the specific intent at the time of the taking to permanently deprive the owner of the property. "[I]ntent is inherently difficult to prove by direct evidence. Therefore, the act itself, together with its surrounding circumstances must generally form the basis from which the intent of the actor may legitimately be inferred." (*People* v. *Proctor* (1959) 169 Cal.App.2d 269, 279 [337 P.2d 93].)

For example, in *People* v. *Pillsbury* (1943) 59 Cal.App.2d 107, 112 [138 P.2d 320], the defendant was found guilty of grand theft of an automobile. His activities after the transfer of a vehicle to him were relevant in determining his intent at the time of the transfer.

In *Pillsbury* the victim, Carl, owned a car. He left it with his fiancee, Dorothy. Pillsbury told Dorothy he could sell the car and he thought his boss, Mr. Newell, was interested in buying it. Dorothy told Carl, and Carl signed a power of attorney, enabling Pillsbury to sell the car. Dorothy gave Pillsbury the car and the keys. Pillsbury took possession of the car and said he would bring the money the next week. Instead of bringing the money to Dorothy, Pillsbury called and said he was delayed. Dorothy requested the

return of the car. Pillsbury said he had to make some repairs. Carl returned home on military leave. Pillsbury returned the car to Carl. When Carl left, he gave the possession of the car back to Pillsbury. Pillsbury kept putting off Dorothy's request for the money or return of the car. He made some minor repairs to the car. When Dorothy continued to press Pillsbury, he said he had a check from his boss, Mr. Newell, and he just needed a release from Newell's wife. Dorothy called the authorities. Pillsbury was arrested and gave up possession of the car. He did not have a boss by the name of Mr. Newell. (59 Cal.App.2d at pp. 109-111.) Defendant Pillsbury's repair of the car and temporary surrender of the car to the owner were relevant and admissible to prove he was acting in accordance with his purpose in taking the automobile to sell it and not to permanently deprive the owner of the property. His subsequent activities were relevant to prove his intent at the time of the taking.

 Although the trial court here was correct that evidence of subsequent activities constituting restitution and restoration cannot be offered as a defense pursuant to Penal Code sections 512 and 513, it applied the statutes too broadly. Penal Code sections 512 and 513 are aimed at the repentant thief who seeks to return that which he knows he illegally obtained; these sections are not applicable when a defendant presents a defense and evidence to demonstrate that his handling of the property was consistent with a nonlarcenous intent at the time of the taking. Although in one context the actions may be viewed as restoration or restitution, when viewed in the perspective of the defense, they would not be acts of restoration and their admission would not be prohibited by Penal Code sections 512 and 513. To hold otherwise would deprive a defendant of presenting probative evidence of value to his defense. Allowing a defendant to present this evidence would not subvert the purposes of Penal Code sections 512 and 513 because the evidence would be admissible only when defendant shows a relevant and probative link in his subsequent actions from which it might be inferred his original intent was innocent.

The instant case illustrates the application of these principles. In one instance, Penal Code sections 512 and 513 apply. Defendant reconveyed the title of the residence to Reed after he was arrested. Such evidence did not bear on the question whether defendant had a wrongful intent when the initial transfer was made; its only relevance was to demonstrate that Reed had been made whole with regard to ownership of his property. It was evidence of restoration only, and its admission was properly denied pursuant to Penal Code section 512.

On the other hand, evidence that defendant improved the property and returned part of the money to Reed was not offered by defendant to show he

made restoration but was presented to show that defendant's intent at the time of the taking was not larcenous. Defendant wanted to show that he gave money back to Reed out of the goodness of his heart. They were spending the money together "just like a family." Defendant wanted to be sure Reed had money. The improvements to the property were also offered by defendant to prove his intent was not larcenous although defendant never clearly articulated how this supported his defense of gift.

The trial court technically erred when it relied on Penal Code sections 512 and 513 to exclude evidence of improvements to the property and to allow evidence for impeachment purposes only of defendant's return of a portion of the money. The evidence was not offered by defendant to show restoration, the purpose for which the evidence would be inadmissible under the relied-upon statute.

■ However, any error was harmless because these actions did little, if anything, to support defendant's defense that he had a nonlarcenous intent. The defense from the outset was that the transactions were gifts given without qualifications. Under defendant's theory of gift, he would have no duty to return any of the money, improve the property, or return the property. Thus the evidence sought to be introduced by defendant added little to his efforts of showing his intent at the time of the takings was not larcenous. Also, the evidence was potentially harmful to defendant because its admission would have allowed the People to argue that defendant gave Reed money and improved the home in order to keep Reed quiet so he could carry out his scheme to keep the real property and use the bulk of the money for his own purposes.

## III.

## CALJIC No. 2.03

■ The jury was instructed pursuant to CALJIC No. 2.03 as follows:

"If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

Defendant asserts the court erred in giving this instruction. Relying on *People* v. *Rubio* (1977) 71 Cal.App.3d 757 [139 Cal.Rptr. 750] (disapproved

on other grounds in *People* v. *Freeman* (1978) 22 Cal.3d 434, 438 [149 Cal.Rptr. 396, 584 P.2d 533]) and *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], defendant contends that since his pretrial statements were not inconsistent with his testimony at trial, CALJIC No. 2.03 unnecessarily singled out his testimony as subject to more scrutiny than the prosecution witnesses.

In *People* v. *Rubio, supra,* the appellate court disapproved of the giving of CALJIC No. 2.03 based on the following:

"The giving of CALJIC No. 2.03 is justified only if there exists evidence that defendant prefabricated a story to explain his conduct. This instruction is *not* applicable in the situation where a defendant makes an explanation of behavior to the police which is *consistent* with his self-serving testimony at trial that conflicts with the prosecution's evidence before the jury. In such a case, the instruction of necessity casts specific doubt on a defendant's credibility as a witness and singles out *defendant's testimony* as subject to more particular scrutiny than that attached to prosecution witnesses." (*People* v. *Rubio, supra,* 71 Cal.App.3d 757, 769.)

Subsequently, in *People* v. *Green, supra,* 27 Cal.3d 1, the Supreme Court discussed *Rubio.* The *Green* court found that the *Rubio* rule did not apply to the circumstances before it. The Supreme Court did not discuss the correctness or incorrectness of the *Rubio* rule.

■ It is well established that pretrial false statements by a defendant may be admitted to support an inference of consciousness of guilt by the defendant. (*People* v. *Showers* (1968) 68 Cal.2d 639, 643 [68 Cal.Rptr. 459, 440 P.2d 939].) ■ In *People* v. *Kimble* (1988) 44 Cal.3d 480 [244 Cal.Rptr. 148, 749 P.2d 803], the Supreme Court examined whether the general rule allowing admission of pretrial false statement applies only when the " 'falsity' is demonstrated by the fact that they are contrary to the defendant's own trial testimony." (*Id.* at p. 496.) The court held that such a restriction is not applicable to pretrial false statements. The court disagreed with the line of cases holding otherwise.

"The logic of this reasoning escapes us. First, because the defendant's prior statement is not being introduced to prove the truth of the statement but simply to prove that the defendant made it, the jury can properly evaluate the evidence to determine if the prior statement was made, whether or not the defendant takes the stand. Second, although the fact that a defendant has —on the witness stand—contradicted a prior statement that he made relating to the crime provides *one* basis for the jury to determine that the earlier

statement was false, it simply does not follow that the jury would necessarily be engaging in 'rank speculation' if it relied on other evidence to determine that the prior statement was false. In many cases, such other evidence— which may consist of physical evidence like fingerprints, or the testimony of trustworthy witnesses—will be equally, if not more, reliable than defendant's own in-court testimony. Of course, the jury need not believe the prosecution's evidence suggesting that the statement was false, and even if it finds that the statement was false, it need not conclude that defendant deliberately lied to hide his complicity in the crime. In brief, the question is one of weight, not admissibility." (*People* v. *Kimble, supra,* 44 Cal.3d 480, 498.)[1]

Here, although there were minor discrepancies between defendant's pretrial statements to Detective Yoon and his trial testimony, his statements were for the most part consistent with his testimony at trial. The falsity in his pretrial statements was proved by testimony of other witnesses. *Kimble* establishes that the pretrial statement of defendant was properly admitted to prove consciousness of guilt.

In *People* v. *Bacigalupo* (1991) 1 Cal.4th 103 [2 Cal.Rptr.2d 335, 820 P.2d 559], the defendant challenged the giving of CALJIC No. 2.03, asserting that it invited the jury to draw biased inferences from isolated items of evidence and was impermissibly argumentative. The Supreme Court rejected this argument, finding that the instruction did not suggest to the jurors that they could infer any mental state or degree of culpability from consciousness of guilt. It held the instruction was not biased or argumentative but was a proper instruction advising the jury of inferences that could rationally be drawn from the evidence. (At p. 128.)

In *People* v. *Kelly* (1992) 1 Cal.4th 495 [3 Cal.Rptr.2d 677, 822 P.2d 385] the Supreme Court again rejected a defendant's argument that CALJIC No. 2.03 was favorable to the prosecution. (At p. 531.)

In light of *Kimball, Bacigalupo* and *Kelly* it is clear that *People* v. *Rubio* is no longer a correct statement of the law. The giving of CALJIC No. 2.03 is justified when there exists evidence that the defendant prefabricated a story to explain his conduct. The falsity of a defendant's pretrial statement may be shown by other evidence even when the pretrial statement is not inconsistent with defendant's testimony at trial. The trial court is required to instruct the

---

[1] In *People* v. *Benson* (1989) 210 Cal.App.3d 1223 [259 Cal.Rptr. 9] the appellate court followed *Kimble* in rejecting the defendant's claim that her pretrial statement was inadmissible because it was not inconsistent with her trial testimony. (*Id.* at p. 1232.) The defendant in *Benson* also argued that CALJIC No. 2.03 was erroneously given. The appellate court commented that it doubted that *Rubio* survived *Kimble;* it disposed of the issue on another basis without deciding the question.

jury on applicable principles of law. When testimony is properly admitted from which an inference of a consciousness of guilt may be drawn, the court has a duty to instruct on the proper method to analyze the testimony. CALJIC No. 2.03 is a correct statement of the law; that it may single out defendant is not a determinative factor.

If the jury here believed the testimony of other witnesses, it could reasonably have found defendant's pretrial statements were willfully false and deliberately misleading. From this, the jury could have inferred a consciousness of guilt. The trial court properly instructed the jury in CALJIC No. 2.03.

## IV.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Dibiaso, Acting P. J., and Franson, J.,† concurred.

---

*See footnote, *ante*, page 1092.

†Retired Presiding Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.