[No. A122351. First Dist., Div. Three. Jan. 29, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
LOU SURIYAN SISUPHAN, Defendant and Appellant.

COUNSEL

William L. Osterhoudt and Dolores T. Osterhoudt for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JENKINS, J.**—Appellant Lou Suriyan Sisuphan took almost $30,000 from his employer's safe, hoping that a coworker would be held responsible for its disappearance and be terminated. He was convicted of embezzlement (Pen. Code, § 508), and appeals from the judgment of conviction. Sisuphan contends that the trial court erred when it failed to instruct the jury that Penal Code section 512 provided a defense to embezzlement if the evidence showed (1) that at the time he took the money, he intended to return it, and (2) that he did so voluntarily before criminal charges were filed against him.[1] He also asserts that the trial court erred in excluding evidence that he had fully restored the money to the company, claiming this evidence showed he never intended to keep it and therefore lacked the requisite intent for the crime. We reject these contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

As the director of finance at Toyota of Marin (the dealership), Sisuphan managed the financing contracts for vehicle sales and worked with lenders to obtain payment for these transactions. He was responsible for ensuring that the proper paperwork was completed for each sale, and he supervised two finance managers who prepared sales contracts, received payments from customers, and issued receipts for car purchases. Sisuphan complained repeatedly to management about the performance and attitude of one of the finance managers, Ian McClelland (McClelland). Specifically, Sisuphan reported that McClelland made frequent mistakes in preparing paperwork and refused to follow his direction. Errors in paperwork delay the income generated by the dealership and strain its relationships with lenders, which Sisuphan was required to maintain. General manager Michael Christian (Christian) opted not to terminate McClelland "because he brought a lot of money into the dealership."

On July 3, 2007, McClelland accepted a large payment from customer Jill Peacock for the vehicle she purchased. Peacock gave him $22,600 in cash and two checks totaling $7,275.51. McClelland prepared a receipt, placed the cash, both checks, and a copy of the receipt in a large manila envelope, and took the envelope to the company safe in Sisuphan's office. McClelland placed the envelope into the hopper at the top of the safe and turned the handle to rotate the hopper and drop its contents down into the safe. The envelope, which was stuffed with a large amount of cash, did not drop all the way down into the safe and became lodged, with a portion "sticking out." McClelland could not retrieve the envelope or push it completely into the

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

safe, so he decided to cut it and transfer the contents to two envelopes. He paged another salesman for assistance but received no response and asked Sisuphan to keep an eye on the envelope while he went to the showroom. While McClelland was gone, Sisuphan "wiggled" the envelope free, extracted it from the safe, and kept it.[2] When McClelland returned, Sisuphan told him "Hey, no problem, [the envelope] dropped into the safe."

Dealership bookkeepers regularly collected payments from the safe and cross-checked these against carbon copies of the receipts in the receipt book. On the morning of July 5, 2007, one of the bookkeepers discovered in this manner that the payment for the Peacock purchase was missing. She placed a Post-it note for Sisuphan on the corresponding page of the receipt book, inquiring, "Where's money?" She also notified the controller, the general sales manager, and Christian that a payment was missing. When she asked Sisuphan about the missing payment, "[h]e said they were looking into it." She asked Sisuphan about the money again on two separate occasions that day, and he gave her the same response each time.

Sisuphan was absent from work for the next 10 days (July 6–15) because his father was ill. The bookkeeper continued to leave him messages about the missing money. On July 11, 2007, she sent an e-mail to Christian, the controller, the general sales manager, and Sisuphan about "the check . . . that has been missing since [July 3]." Christian was initially under the impression that only a check was missing and did not learn until the week of July 11 that the purchase involved a cash payment. Realizing that the matter was more serious than he had believed, Christian followed up with the customer, made a police report, and filed a claim with the dealership's insurer. He called all the managers together and told them he would not bring criminal charges if the money was returned within 24 hours. Sisuphan learned of Christian's amnesty overture either at a meeting or in a telephone conversation, but continued to deny any knowledge of what had happened to the money. Christian notified the dealership's owner of the problem and, at his direction, hired a private investigator, who interviewed a number of employees, including Sisuphan, on July 18, 2007.

On the evening of July 18, 2007, Sisuphan met for several hours with Christian and the general sales manager, Joel Hanson (Hanson), about problems in the finance department, primarily, the accuracy of the paperwork and the dealership's relationships with lenders. They discussed concerns that sloppy management had led to the disappearance of the money and that the incident had impacted morale, causing employees to question one another. Shortly after the meeting ended, Sisuphan returned to Christian's office and

---

[2] Sisuphan was not authorized to remove money from the safe and did not have the combination.

admitted that he had taken the money. He claimed he had no intention of stealing it and had taken it to get McClelland fired. He said he had not returned the money during the 24-hour amnesty period because he did not believe Christian's assurance that no punitive action would be taken. Later that night, Sisuphan telephoned Hanson and confessed to him as well. He told Hanson he had taken the money to prove a point—that McClelland was "sloppy" in handling the dealership's money. Christian and Hanson trusted Sisuphan and were shocked that he had taken the money.

The next day, Christian terminated Sisuphan's employment. He prepared a separation report with a narrative that set out the events relating to the missing money and included a summary of Sisuphan's confession. Sisuphan reviewed and signed the report without making any changes and repaid the entire sum of cash he had taken. As defense counsel conceded below, however, "[t]he checks were lost [and] not returned." The customer stopped payment on both checks and reissued them.

A week later, the district attorney filed a criminal complaint against Sisuphan, asserting a felony offense of embezzlement by an employee of property valued in excess of $400 (§§ 487, subd. (a), 508, 514) and alleging a prior assault conviction (§ 245, subd. (a)(2)) as a sentence enhancement. After waiving a preliminary hearing, Sisuphan was held to answer on this count. In February 2008, he was charged in accordance with the complaint. The matter proceeded to a jury trial on April 15, 2008, and the jury returned a guilty verdict. In June 2008, the trial court sentenced Sisuphan to 120 days in custody and three years' probation. Sisuphan filed a timely notice of appeal from the judgment of conviction.

## DISCUSSION

I. *Section 512 Does Not Provide a Defense to Embezzlement.*

Relying largely on principles of statutory construction, Sisuphan contends that section 512 establishes a defense to embezzlement—a "limited amnesty" for those who intend at the time of the taking to return the property and do so before criminal charges are filed. Consistent with his interpretation of section 512, he requested a jury instruction on this purported defense and provided three proposed instructions for the trial court's consideration.[3] The trial court

---

[3] Sisuphan's first two instructions set forth his contention that the taking was not unlawful, because he "restored the funds," and require the People to prove beyond a reasonable doubt either that he did not intend at the time of the taking to restore the property or that he did not fully restore it before criminal charges were filed. The third instruction asserts that a taking is excusable and not unlawful when the accused both intends to restore the property at the time of the taking and fully restores it before criminal charges are filed.

rejected his proposed instructions, concluding that restoration of the property may be considered only in mitigation of punishment. Sisuphan contends that the trial court erred in failing to instruct on a defense under section 512 and that "[this] error was exacerbated when the trial court affirmatively mis-instructed the jury": "An intent to deprive the owner of property, even temporarily, is enough. Intent to restore the property to its owner is not a defense." Assuming the conditions set forth in section 512 are met, he maintains, intent to restore is a defense, and no embezzlement will lie, even though defendant intended to deprive the owner of the property temporarily.

■ A trial court must instruct the jury, upon request, on any theory of defense that is supported by substantial evidence. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78 [59 Cal.Rptr.3d 653].) We independently review a trial court's alleged failure to do so. (*Ibid.*) Here, the trial court's obligation to give Sisuphan's proposed instructions turns on whether section 512, properly interpreted, provides a defense to the crime of embezzlement.[4] Questions of statutory interpretation are subject to de novo review as well. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) ■ In construing a statute, "[t]he fundamental rule is that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " (*People v. Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104].) In making this determination, the court considers the words of the statute in the context of the statutory framework, giving " 'significance . . . to every word, phrase, sentence[,] and part of an act in pursuance of the legislative purpose,' " and avoiding a construction that renders some words surplusage. (*Ibid.*) If the language is clear, the statute's plain meaning generally controls. (*People v. Dieck* (2009) 46 Cal.4th 934, 940 [95 Cal.Rptr.3d 408, 209 P.3d 623].) If the statutory language permits more than one reasonable interpretation, however, it is ambiguous, and we turn to other sources, including legislative history and public policy, to resolve the ambiguity. (*Ibid.*; *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].)

---

[4] Because Sisuphan's first two instructions allocate the burden of proof to the People to disprove the alleged defense, we question whether the trial court could properly have given them in any case. (See *People v. Mickey* (1991) 54 Cal.3d 612, 701 [286 Cal.Rptr. 801, 818 P.2d 84] [a trial court must refuse a proposed instruction that is not legally correct].) Affirmative defenses generally must be raised and proved by the defendant, not negated by the People. (See *People v. Neidinger* (2006) 40 Cal.4th 67, 75 [51 Cal.Rptr.3d 45, 146 P.3d 502] [" ' "where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the exception is an affirmative defense to be raised and proved by the defendant" ' "]; and *id.* at p. 74 [the People must be held to their burden to prove each element of the offense, but " '[d]ue process does not require that the state prove the nonexistence of a constitutionally permissible affirmative defense . . .' "].) Nonetheless, as the third instruction contains no such defect and confines itself to the elements of the purported defense, we address the question Sisuphan raises on the merits.

Section 512 provides: *"The fact that the accused intended to restore the property embezzled, is no ground of defense or mitigation of punishment, if it has not been restored before an information has been laid before a magistrate, or an indictment found by a grand jury, charging the commission of the offense."* (Italics added.) Sisuphan does not claim that this provision expressly establishes intent to restore as a defense to embezzlement, but argues that such a defense is implicit in the statutory language. He maintains that the statute's preclusion of intent to restore as a defense when the accused fails to make timely restoration gives rise to such a defense, by negative implication, if the property is timely restored.

Sisuphan relies on principles of statutory interpretation to support his reading of section 512 and argues this provision must be viewed in the context of the statutory framework as a whole. He contends section 512 must be read together with its companion statute, section 513, in a manner that gives effect to both provisions. According to Sisuphan, since section 513 sanctions consideration of voluntary and timely restoration as a mitigating factor at sentencing, section 512 must address something other than sentencing concerns if we are to avoid a construction that renders it "mere surplusage."[5] He maintains that sections 512 and 513 are given independent effect only if section 512 is construed to provide a defense. In Sisuphan's view, sections 512 and 513 both address the significance of actual restoration, with each provision affording it a different import, depending on the defendant's intent at the time of the offense. According to Sisuphan, if the defendant intends at the time of the taking to restore the property, restoration is a defense under section 512; alternatively, if he has no such intent, but later restores the property, restoration may mitigate his sentence under section 513. Sisuphan contends that his construction comports with the language and placement of section 512 in the statutory scheme and is the only reasonable interpretation of this provision. We disagree.[6]

Looking first to the statutory language, we observe that section 512 effectively contains two subject complements, "ground of defense" and

[5] Section 513 states: "Whenever, prior to an information laid before a magistrate, or an indictment found by a grand jury, charging the commission of embezzlement, the person accused voluntarily and actually restores or tenders restoration of the property alleged to have been embezzled, or any part thereof, such fact is not a ground of defense, but it authorizes the court to mitigate punishment, in its discretion." In *People v. Kirwin* (1927) 87 Cal.App. 783, 785 [262 P. 803] (*Kirwin*), the Court of Appeal construed this language to require voluntary restoration of the property before the filing of criminal charges.

[6] Sisuphan also argues that since section 511 precedes section 512 and expressly provides an affirmative defense to embezzlement, section 512 must be read, in like manner, as an affirmative defense. (See § 511 [defense for "claim of title"].) We are not persuaded. The most we can say is that each provision addresses the general subject of defenses. We decline the invitation to jump from this general proposition to the specific conclusion Sisuphan advocates here.

"[ground of] mitigation of punishment." The statute's meaning turns on whether the conditional clause ("if it has not been restored . . .") modifies each of these or only the second. If, as Sisuphan maintains, the conditional language applies to both "ground of defense" and "[ground of] mitigation," section 512 may be read to provide a conditional defense. If, on the other hand, the conditional clause modifies only "[ground of] mitigation," the statute precludes intent to restore as a defense absolutely. In our view, the statute is reasonably susceptible of both interpretations and reflects an ambiguity on its face. Accordingly, we consider the legislative history of sections 512 and 513 to determine which construction the Legislature intended.

Sections 512 and 513 were enacted in 1872 as part of the original California Penal Code and were modeled on identically worded sections from Field's 1864 Draft of the New York Penal Code (Field Code). (Code commrs., note foll. Ann. Pen. Code, § 514 (1st ed. 1872, Haymond & Burch, commrs. annotators) p. 198 ["[This Chapter] is taken from the Chapter of the New York Penal Code on the same subject, Sec. 601, et seq."]; see Field Code, §§ 610, 611.) Like the Field Code provision on which it was modeled, the original version of section 512 provided: "The fact that the accused intended to restore the property embezzled, is no ground of defense or *of* mitigation of punishment, if it has not been restored before an information has been laid before a magistrate, charging the commission of the offense." (Pen. Code, former § 512, enacted in 1872, italics added; see Field Code, § 610.)[7] The original statute's parallel construction ("of defense or of mitigation of punishment") suggests that it should be read in two parts, the first establishing absolutely that intent to restore is not a defense and the second precluding such intent as a mitigating factor in the absence of certain conditions (i.e., voluntary and timely restoration of the property). Indeed, the original margin note to section 512, also taken from the Field Code, states: "Intent to restore the property is no defense." (Pen. Code, former § 512, enacted in 1872; cf. Field Code, § 610.) This note, which was part of the official enactment, leaves little doubt as to the California Legislature's purpose in enacting section 512 and its intended meaning for the statutory language.[8] Thus, the original version of the statute itself reveals a clear intent not to afford a defense under section 512.

The construction of a later, substantially similar version of Field Code section 610 in *People v. Kaye* (1945) 295 N.Y. 9 [64 N.E.2d 268] (*Kaye*),

---

[7] The italicized language reflects a slight difference in the original wording of section 512. The statute was amended in 1905 to delete "of" before "mitigation of punishment" and to add "or an indictment found by a grand jury" between "magistrate" and "charging the commission of the offense." (Stats. 1905, ch. 520, § 1, p. 682.)

[8] Margin notes are indicative of legislative intent and are proper considerations in construing a statute. (See *People v. Clark* (1992) 10 Cal.App.4th 1259, 1265–1266 [13 Cal.Rptr.2d 209].)

lends forceful support to our analysis. In *Kaye*, New York's highest court upheld the trial court's refusal to instruct on a defense under former section 1307 of the New York Penal Law, concluding that, under this provision, "[i]ntent to return, with or without actual return, is no defense but the sentencing judge may consider such facts 'in mitigation of punishment' . . . ." (64 N.E.2d at p. 270.)[9] The court explained that "[t]he purpose of the statute, couched in the negative, was to forbid and not to authorize, to deny a defense and not to provide one, to make it plain that once a theft had been proven, restitution was no concern of the jury, but only a fact that the judge might consider in fixing the penalty." (64 N.E.2d at p. 270.) In construing the statute, the court noted the interpretation of the dissenting justices in the lower court: "if property has been stolen or embezzled, intent to return it is no defense at all but such intent is ground for mitigation of punishment if [timely restoration is made] . . . . The meaning of [this provision] . . . is the same as if it consisted of two distinct propositions (like the California Penal Code, §§ 512 and 513): one proposition denying a 'defense', the other authorizing 'mitigation of punishment.' " (*Kaye*, at p. 269.)

We construe Penal Code section 512 in the same manner as the court in *Kaye* construed New York Penal Law former section 1307. The language of section 512, as originally enacted, is identical to Field Code section 610 and varies in no significant respect from its New York statutory counterpart (N.Y. Pen. Law, former § 1307). (See 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 32, p. 62 ["Where a statute is patterned on a statute of another jurisdiction the construction given by the courts of the other jurisdiction is persuasive."], citing *Erlich v. Municipal Court* (1961) 55 Cal.2d 553, 558 [11 Cal.Rptr. 758, 360 P.2d 334] ["This statute, having been patterned on a similar New York statute, should be given, insofar as the language is the same, the same construction as that given to the New York statutes by the courts of New York."].)[10] In so concluding, we

---

[9] Section 610 of the Field Code was modified and enacted in 1881 as former section 549 of the New York Penal Code, which was later renumbered as section 1307 of the New York Penal Law. (*Kaye, supra*, 64 N.E.2d at pp. 269–270.) Former section 1307 provided: "INTENT TO RESTORE PROPERTY NO DEFENSE. The fact that the defendant intended to restore the property stolen or embezzled, is no ground of defense, or of mitigation of punishment, if it has not been restored before complaint to a magistrate, charging the commission of the crime." (See *Kaye*, at p. 269.) Section 611 of the Field Code, which is identical to Penal Code section 513, was never enacted. (*Kaye*, at p. 270.)

[10] Indeed, the only difference between the original version of Penal Code section 512 and Field Code section 610 is a comma that appears after the word "defense" in Field Code section 610 but is not included in section 512. (See Field Code, § 610 ["that the accused intended to restore the property embezzled, is no ground of defense, or of mitigation of punishment, if it has not been restored . . ."].) This comma, which also appeared in New York Penal Law former section 1307, sets apart the absolute phrase ("no ground of defense") from the conditional alternative ("or of mitigation of punishment, if it has not been restored . . .") and separates the provision into two ideas, providing additional support for the court's construction of the statute

reject Sisuphan's contention that the court in *Kaye* ignored principles of statutory construction. The court did not concede, as he asserts, that its construction conflicted with the statutory language or that it had "[read] an entire statute out of existence." In acknowledging that its holding "leaves the statute pretty much [a] dead letter," the court was explaining that the statute added nothing to the common law, as it merely restated the principle that restitution is not a defense, and specified what a sentencing judge could consider, even though "he certainly could do [so] without any statutory permission." (*Kaye, supra,* 64 N.E.2d at p. 270.)

■ Accordingly, we hold that under section 512, intent to restore the property is not a defense, even if it is present at the time of the taking.

■ Our interpretation of section 512 is consistent with the principles of statutory construction on which Sisuphan relies and does not render section 513 mere surplusage. A proper reading of these provisions turns on the distinction between a defendant's restorative intent at the time of the taking (§ 512) and his subsequent act of restoration (§ 513). Section 512 precludes an affirmative defense based on a defendant's contemporaneous restorative intent and also provides that such intent alone (i.e., in the absence of timely restoration) does not constitute a mitigating circumstance at sentencing. Section 513, by contrast, establishes a defendant's subsequent restorative action, if timely and voluntarily made, as a mitigating factor at sentencing.[11]

Our construction also comports with established case law holding that intent to permanently deprive the owner of the property is not required to establish embezzlement (see, e.g., *People v. Dolbeer* (1963) 214 Cal.App.2d 619, 625 [29 Cal.Rptr. 573]; *People v. Talbot* (1934) 220 Cal. 3, 14, 16 [28 P.2d 1057] (*Talbot*)), that restoration of the property is not a defense (see, e.g., *People v. Pond* (1955) 44 Cal.2d 665, 674 [284 P.2d 793]; *People v. Royce* (1895) 106 Cal. 173, 188–189 [39 P. 524]), and that the offense is complete at the time of the taking (see, e.g., *People v. Dolbeer, supra,* at p. 625; *People v. Parker* (1965) 235 Cal.App.2d 100, 109 [44 Cal.Rptr. 909];

in *Kaye*. (See § 1307 ["that the defendant intended to restore the property stolen or embezzled, is no ground of defense, or of mitigation of punishment, if it has not been restored . . ."].) The omission of this comma from section 512 does not alter our construction of the statute; the original margin note, taken directly from Field Code section 610, confirms the intent of the California Legislature to preclude a defense, not to create one. (See Pen. Code, former § 512, enacted in 1872 ["Intent to restore the property is no defense"]; cf. Field Code, § 610; see *People v. Ramirez* (1972) 27 Cal.App.3d 660, 666 [104 Cal.Rptr. 102] [literal construction resulting from clerical error in omitting a comma does not trump legislative purpose and intent].)

[11] The court in *Kaye* recognized that sections 512 and 513 of the Penal Code had two distinct functions and noted that its task of interpreting New York Penal Law former section 1307 would have been easier if both sections of the Field Code (§§ 610 and 611) had been enacted. (*Kaye, supra,* 64 N.E.2d at pp. 269–270.)

*Talbot, supra,* at p. 16). Sisuphan's "no harm, no foul" interpretation contradicts this authority and flies in the face of public policy protecting the rights of property owners. Such a construction would allow an agent to take property without the owner's permission or knowledge and keep it indefinitely, without consequence, until the owner filed criminal charges. (See *Kaye, supra,* 64 N.E.2d at p. 270 [noting "the ancient rule that a thief may not purge himself of guilt, by giving back the plunder, before or after arrest"].)

Sisuphan cites three California decisions in support of his interpretation of the statute, contending they "appear to recognize that a defense may lie under [s]ection 512, when both intent to restore and actual timely restoration are present." We have reviewed this authority, but find, as discussed below, that it does not alter our conclusion. In *People v. McLean* (1902) 135 Cal. 306 [67 P. 770], the court noted, "It is provided in [section 512] that the fact that the accused intended to restore the property is no defense, unless the property has been restored before an information has been laid charging the commission of the offense." (*People v. McLean,* at pp. 307–308 [defendant jeweler refused to sell or return jewelry, as promised].) Similarly, in *Talbot,* when corporate officers appropriated funds for personal reasons and characterized these transactions as "advances," the court concluded: "the fact that such officers intended to restore the money or property is of no avail to them if it has not been restored before information laid or indictment found charging them with embezzlement . . . ." (*Talbot, supra,* 220 Cal. at pp. 9–11, 13, 15.) We note, however, that neither court decided the question before us: whether contemporaneous intent to return the property coupled with subsequent restoration constitutes a defense under section 512. Accordingly, to the extent the court's reference to the statute's conditional language suggests the existence of such a defense, it was unnecessary to the court's decision and, therefore, dicta. (See *People v. Nguyen* (2000) 22 Cal.4th 872, 879 [95 Cal.Rptr.2d 178, 997 P.2d 493].)

Sisuphan also relies on language in *Kirwin* indicating section 512 "does not provide that restitution is a defense, but that it is not a defense except under certain circumstances." (*Kirwin, supra,* 87 Cal.App. at pp. 784–785.) *Kirwin* is ambiguous at best, however, as to whether the court is acknowledging a defense under section 512. Immediately after implying that "restitution" is a limited defense, the court observed, "[Section 512] must be read in connection with section 513 of the same code, which is to the effect that when all proper circumstances are present the fact of restitution 'is not a ground of defense, but it authorizes the court to mitigate punishment, in its discretion.'" (87 Cal.App. at p. 785.) Thus, after reading sections 512 and 513 together, the court appears to have recognized that, even when the statutory conditions are met, restitution is relevant only in the context of mitigation. Moreover, we find that *Kirwin* lacks persuasive force in any case because the

court construed the plain language of the statute and did not conduct rigorous scrutiny of the legislative history or consider the Legislature's intent.

In short, none of the authority Sisuphan cites expressly holds that section 512 provides a defense to embezzlement or reversed an embezzlement conviction on this ground. Indeed, we find no published California decision that does so.

■ We turn, finally, to Sisuphan's assertion that "when statutory language is susceptible [of] two constructions, a court is required to adopt the one which is more favorable to the defendant," as he "is entitled to the benefit of every reasonable doubt, 'whether it arises out of a question of fact, or as to the true interpretation of words or the construction of language used in the statute.' " (See *People v. Collins* (1983) 143 Cal.App.3d 742, 745 [192 Cal.Rptr. 101]; *In re Tartar* (1959) 52 Cal.2d 250, 256–257 [339 P.2d 553].) This rule applies only when the court is faced with two equally plausible constructions and, after considering all aids to its interpretation, can do no more than guess the Legislature's intent. (*Muscarello v. United States* (1998) 524 U.S. 125, 138–139 [141 L.Ed.2d 111, 118 S.Ct. 1911] [discussing the "rule of lenity"]; *In re Ramon A.* (1995) 40 Cal.App.4th 935, 941 [47 Cal.Rptr.2d 59] [rule inapplicable unless two reasonable interpretations stand in "relative equipoise" and some doubt exists as to the legislative purpose].) In light of the legislative history discussed above, there remains no reasonable doubt as to the Legislature's intent in enacting section 512, and Sisuphan's reading of the statute is simply not plausible. We do not construe ambiguities in a defendant's favor if doing so would produce an absurd result or one that conflicts with clear legislative intent. (*People v. Cruz* (1996) 13 Cal.4th 764, 783 [55 Cal.Rptr.2d 117, 919 P.2d 731].)

We conclude that section 512 does not establish a defense on which the trial court was obligated to instruct the jury.

## II.  *The Trial Court's Evidentiary Ruling Was Proper.*

The trial court excluded evidence that Sisuphan returned the money to the dealership, concluding it was not relevant, since return of the property is not a defense to embezzlement. Sisuphan contends that evidence of repayment was relevant to show he lacked fraudulent intent at the time he took the money and asserts, for this reason, that the trial court's ruling violated his Fifth Amendment right to present a defense and "all pertinent evidence of significant value to that defense." (*People v. Edwards* (1992) 8 Cal.App.4th 1092,

1099 [10 Cal.Rptr.2d 821] (*Edwards*); see *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 93 S.Ct. 1038].) We review the trial court's evidentiary ruling for abuse of discretion. (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 343, fn. 9 [234 Cal.Rptr. 442].)

█ Fraudulent intent is an essential element of embezzlement. (*Talbot, supra*, 220 Cal. at p. 13.) Although restoration of the property is not a defense, evidence of repayment may be relevant to the extent it shows that a defendant's intent at the time of the taking was not fraudulent. (*Edwards, supra*, 8 Cal.App.4th at pp. 1100–1101 [evidence that the defendant made payments to the victim and improvements to the victim's home "out of the goodness of his heart," claiming the property was a gift from the victim]; *People v. Marsh* (1962) 58 Cal.2d 732, 736 [26 Cal.Rptr. 300, 376 P.2d 300]; *People v. Dubrin* (1965) 232 Cal.App.2d 674, 679 [43 Cal.Rptr. 60].) Such evidence is admissible "only when [a] defendant shows a relevant and probative link in his subsequent actions from which it might be inferred his original intent was innocent." (*Edwards, supra*, at pp. 1100–1101.) The question before us, therefore, is whether evidence that Sisuphan returned the money reasonably tends to prove he lacked the requisite intent at the time of the taking. (See Evid. Code, § 210 [evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].)

Section 508, which sets out the offense of which Sisuphan was convicted, provides: "Every clerk, agent, or servant of any person who fraudulently appropriates to his own use, or secretes with a fraudulent intent to appropriate to his own use, any property of another which has come into his control or care by virtue of his employment . . . is guilty of embezzlement." Sisuphan denies he ever intended "to use the [money] to financially better himself, even temporarily" and contends the evidence he sought to introduce showed "he returned the [money] without having appropriated it to his own use in any way." He argues that this evidence negates fraudulent intent because it supports his claim that he took the money to get McClelland fired and acted "to help his company by drawing attention to the inadequacy and incompetency of an employee." We reject these contentions.

█ In determining whether Sisuphan's intent was fraudulent at the time of the taking, the issue is not whether he intended to spend the money, but whether he intended to use it for a purpose other than that for which the dealership entrusted it to him.[12] The offense of embezzlement contemplates a

---

[12] "[T]hat the property was never 'applied to the embezzler's personal use or benefit' " is no defense. (*In re Basinger* (1988) 45 Cal.3d 1348, 1363–1364 [249 Cal.Rptr. 110, 756 P.2d 833].) The actus reus of the crime of embezzlement is the conversion of property. (See *id.* at p. 1363 ["Embezzlement requires conversion of trusted funds coupled with the intent to

principal's entrustment of property to an agent for certain purposes and the agent's breach of that trust by acting outside his authority in his use of the property. (See § 503 ["Embezzlement is the fraudulent appropriation of property by a person to whom it has been [e]ntrusted."]; *Talbot, supra,* 220 Cal. at pp. 15–16 [relying on the dictionary definition of fraud: " ' "Any act . . . that involves a breach of duty, trust, or confidence, and which is injurious to another, or by which an undue advantage is taken of another" ' " in concluding that "it is the immediate breach of trust that makes the offense . . ."]; CALCRIM No. 1806 ["A person acts fraudulently when he or she takes undue advantage of another person or causes loss to that person by breaching a duty [of] trust or confidence." (italics omitted)]; *People v. Hodges* (1957) 153 Cal.App.2d 788, 793 [315 P.2d 38] ["The gist of [embezzlement] is the appropriation to one's own use of property delivered to him for devotion to a specified purpose other than his own enjoyment of it."].) Thus, an employee who intentionally deprives his employer of property, even temporarily, and uses it for a purpose outside the scope of the trust, fraudulently appropriates it "to his own use" within the meaning of section 508. (*People v. McClain* (1956) 140 Cal.App.2d 899, 900 [295 P.2d 952] [" 'The intent essential to embezzlement is the intent to fraudulently appropriate the property to a use and purpose other than that for which it was entrusted, in other words, the intent to deprive the owner of his property . . . even though . . . only temporarily . . . .' "]; see *In re Basinger, supra,* 45 Cal.3d at pp. 1363–1364 [an intent to permanently deprive the owner of the property is not required].)[13] Sisuphan's undisputed purpose—to get McClelland fired—was beyond the scope of his responsibility and therefore outside the trust afforded him by the dealership. Accordingly, even if the proffered evidence shows he took the money for this purpose, it does not tend to prove he lacked fraudulent intent,[14] and the trial court properly excluded this evidence.

---

defraud."].) Conversion does not require that a defendant act with the intent to benefit himself. (See *People v. Wyman* (1894) 102 Cal. 552, 557 [36 P. 932] [criminal conversion occurs when defendant exercises dominion over property inconsistent with the owner's rights]; 18 Am.Jur.2d (2010) Conversion, § 156 [exertion of unauthorized control over the property]; see also *De Vries v. Brumback* (1960) 53 Cal.2d 643, 647 [2 Cal.Rptr. 764, 349 P.2d 532] [" 'an act of wilful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession' "].)

[13] Some courts have framed the intent element as an intent to deprive the owner of the property "unlawfully." (See, e.g., *People v. Petrin* (1954) 122 Cal.App.2d 578, 581–582 [265 P.2d 149]; *People v. Cannon* (1947) 77 Cal.App.2d 678, 689 [176 P.2d 409].)

[14] Sisuphan's claim that he acted for the dealership's benefit does not change this result. He mischaracterizes the authority on which he relies in contending that use of property with the intent to benefit its owner is not fraudulent. In *Talbot,* the defendant claimed he used company funds for a corporate purpose within his authority as an officer and director—in other words, that he acted within the scope of the trust. (See *Talbot, supra,* 220 Cal. at pp. 8–9, 16.)

## DISPOSITION

The judgment is affirmed.

Pollak, Acting P. J., and Siggins, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 28, 2010, S180799.