[Crim. No. 5612.   In Bank.   June 10, 1955.]

THE PEOPLE, Respondent, v. STILLMAN POND, Appellant.

Cannon & Callister and Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), and Robert Wheeler, Deputy District Attorney, for Respondent.

SCHAUER, J.—Defendant, a real estate broker, was charged with grand theft in violation of paragraph 1 of section 487 of the Penal Code. That statute provides in material part, ''Grand theft is theft committed in any of the following cases: 1. When the money, labor or real or personal property taken is of a value exceeding two hundred dollars . . .'' Defendant pleaded not guilty and was tried by a jury instructed at length, among other things, as to the sections of the Labor Code which regulated the exaction by employers of cash bonds from employes or applicants, including section 405, which provides that misuse by an employer of such a cash bond is theft.[1] The jury found defendant guilty. He appeals from an order denying his motion for new trial. For reasons more fully explained hereinafter,

---

[1]Section 405 of the Labor Code provides: ''Any property put up by any employee or applicant as a bond shall not be used for any purpose other than liquidating accounts between the employer and employee or for return to the employee or applicant and shall be held in trust for this purpose and not mingled with the property of the employer. No contract between the employer and employee or applicant shall abrogate the provisions of this section. Any employer or prospective employer, or agent or officer thereof, who misappropriates any such property, mingles it with his own, or uses it for any other purpose than that herein set forth is guilty of theft and shall be punished in accordance with the provisions of the Penal Code relating to theft.''

we have concluded that the order must be reversed because so far as the record discloses defendant may well have been convicted of offenses (violations of Lab. Code, § 405) not charged in the indictment.

The indictment alleges 10 counts of "Grand Theft (Vio. Sec. 487.1 P C)," the taking of money of various victims. During the trial, after the close of the People's case, Counts 3 and 4 were dismissed on motion of the People because the complaining witness as to those counts had become ill and could not complete her testimony. The jury found defendant guilty on Counts 1, 2, 9, and 10 and not guilty on Counts 5 and 6; they were unable to agree as to Counts 7 and 8 and those counts were dismissed. Defendant's motion for a new trial was denied. The trial court ordered the proceedings suspended as to Counts 1, 2, 9, and 10 and granted probation upon certain conditions.

On appeal defendant originally contended (through counsel other than his present attorney) that (1) the trial court erred in denying his motions for declaration of a mistrial and for continuance, made at the conclusion of the People's case when it was learned that the prosecuting witness as to Counts 3 and 4 would be unable to complete her testimony; (2) the trial court prevented defendant from presenting his defense by sustaining objections to his offers of proof intended to show that he engaged in the transactions charged as crimes and in other business transactions in an effort to rehabilitate himself financially, and that the conduct of a business associate (the prosecuting witness as to Counts 3 and 4) made it impossible for defendant to complete those transactions; (3) remarks of the trial judge during the trial prejudiced defendant; (4) the verdicts of guilty are contrary to the evidence. The People oppose these contentions and urge that the convictions can be upheld under section 405 of the Labor Code. Defendant replies that reliance cannot be placed on section 405 because the indictment did not charge a violation of that section, and that the section is unconstitutional.

The record on appeal originally did not include the instructions to the jury and contained no mention of the Labor Code and no indication that the People, defendant, or the judge considered that defendant was being tried for violation of section 405 of that code. So far as appeared from the matter then in the record, the People, defendant, and the judge considered that the evidence was directed to establishing the crime of theft on the theory of obtaining money by false

pretenses or perhaps larceny by trick and device or embezzlement.

At oral argument before this court, defendant's present counsel, when he commenced to present his contentions concerning section 405 of the Labor Code, requested that the record on appeal be augmented to include the instructions to the jury. This has since been done and it now appears, as stated above, that the jury were instructed at length as to the Labor Code sections (400-410) which regulate the exaction by employers of cash bonds from employes or applicants.[2]

*Evidence as to Counts 1 and 2*

Count 1 charged grand theft of $5,500 from Mr. and Mrs. G. M. Bradford on or about April 24, 1951. Count 2 charged grand theft of $1,000 from Mr. and Mrs. J. A. Reinders on or about August 30, 1951. As previously stated, defendant was found guilty on each of these counts.

Defendant carried on a real estate business in Lancaster. Mr. and Mrs. Bradford, who were interested in buying and operating a chicken ranch, saw a newspaper advertisement of

---

[2]The jury were told:

"You are instructed that any property put up by an employee or applicant as a part of the contract of employment directly or indirectly, shall be deemed put up as a bond and is subject to the provisions of this article whether the property is put up on a note or as a loan or an investment and regardless of the wording of the agreement under which it is put up. [Lab. Code, § 406.]

"You are instructed that no employer shall demand, exact or accept any cash bond from any employee or applicant unless:

"(a) The employee or applicant is entrusted with property of an equivalent value, or

"(b) The employer advances regularly to the employee goods, wares, or merchandise to be delivered or sold by the employee, and for which the employer is reimbursed by the employee at regular periodic intervals, and the employer limits the cash bond to an amount sufficient to cover the value of the goods, wares, or merchandise so advanced during the period prior to the payment therefor. [Lab. Code, § 402.]

"You are instructed that if cash is received as a bond it shall be deposited in a savings account in a bank authorized to do business in this State, and may be withdrawn only upon the joint signatures of the employer and the employee or applicant. [Lab. Code, § 403.]

"Section 405 of the State Labor Code provides that any property put up by an employee or applicant as a bond shall not be used for any purpose other than liquidating accounts between the employer and the employee or for return to the employee or applicant and shall be held in trust for this purpose and not mingled with the property of the employer. No contract between the employer and employee or applicant shall abrogate the provisions of this section. *Any employer or prospective employer or agent or officer thereof who misappropriates any such property, mingles it with his own, or uses it for any other purpose than that herein set forth is guilty of theft.*" (Italics added.)

defendant. On April 24, 1951, they went to defendant's office and told him of their previous experience in raising chickens and their interest in that business. Bradford said that he had $7,000 and wanted to buy a chicken ranch. Defendant showed the Bradfords various ranches but said, "I don't think you have got quite enough money for them." Defendant then showed them his own ranch, where a chicken house was under construction, and told Bradford that he needed a man such as Bradford, that if the Bradfords would do all the work of raising chickens defendant would "furnish everything," that the Bradfords could live in a house on the ranch, that Bradford would have to deposit $5,500 with defendant, and that in a short time he would receive his money back and a large profit. Defendant and the Bradfords executed a written contract dated April 24, 1951, which provided that the Bradfords "agreed to put up $5,500.00 as a guarantee that they will properly supervise and operate the chicken house"; defendant agreed to furnish living quarters and all equipment; net income was to be divided 75 per cent to the Bradfords and 25 per cent to defendant until the Bradfords received $5,500, then 60 per cent to the Bradfords and 40 per cent to defendant; no termination date was stated. Bradford delivered his check for $5,500 to defendant. Defendant orally promised that "the house would be furnished and the chicken house would be finished and ready to go into production of chickens on the 9th of May." Defendant cashed Bradford's $5,500 check and, according to his testimony, the proceeds were "just used in my regular business."

About May 6th the Bradfords received a letter from defendant stating that the house and chicken house would be ready for the Bradfords on the 9th. On May 9th they returned to defendant's ranch and found that the house and chicken house were not completed. Defendant had the Bradfords move into an apartment near his own house "until a short time, he said, until the chicken house was completed," and hired Bradford as foreman, "planting crops and things, and doing the ranch work." Bradford worked for defendant for $150 a month for four months; during this time "work on the chicken house practically stopped" and "there were no chickens in it at any time." Defendant then discharged Bradford because "He said I had been talking about my business and his business to other people"; Bradford admitted that he had done so. The Bradfords continued to live in defendant's apartment, and Bradford worked at other ranches,

until February, 1952. Defendant said that Bradford occupied the apartment in lieu of receiving interest on his $5,500. During the 10 months Bradford remained in the apartment he asked defendant about once a week for the return of his $5,500 and defendant repeatedly said, "Well, it won't be long now," or specified a date for payment, then said, "I can't give it to you now, I have got other deals on." Defendant finally repaid the $5,500 to the Bradfords on October 31, 1952.

The evidence as to defendant's obtaining $1,000 from Mr. and Mrs. Reinders on or about August 30, 1951, as charged in Count 2, shows a transaction with defendant materially similar to that of the Bradfords. Reinders gave defendant his check for $1,000 on August 29, 1951, pursuant to an agreement similar to that above summarized between defendant and the Bradfords. The Reinders moved to defendant's ranch on September 15, 1951. No chicken ranching was carried on during Reinders' stay. He worked for defendant for a weekly wage until March 2, 1952. He received $500 of his $1,000 from defendant on March 21, 1952, and the remaining $500 on November 19, 1952, just after Reinders had testified before the grand jury as to this matter.

Defendant urges that the evidence does not support the findings of theft as to Counts 1 and 2 because, he says, it shows that the arrangements of defendant with the Bradfords and with the Reinders were joint ventures or partnerships; he cites the conflicting views of *People* v. *Foss* (1936), 7 Cal.2d 669, 670 [62 P.2d 372] ["The rule that a partner cannot steal from the partnership is, of course, well settled"; dictum, citing no authority], and *People* v. *Cravens* (1947), 79 Cal. App.2d 658, 662-663 [180 P.2d 453] ["In the few cases which we have found on the precise subject it has been held that the procuring of money to be contributed to the capital of a partnership of which the victim is a member cannot constitute the crime of obtaining money by false pretenses because the victim as partner retains an interest in the fund. [Citations from other jurisdictions.] We are not satisfied that proof that the wrongdoer afterwards converted the partnership property to his own use while the victim was still subject to the influence of his false pretenses would not constitute the crime of obtaining money or property by false pretenses"].

■ Manifestly the money paid to defendant by the Bradfords and the Reinders, characterized in their agreements as a "guarantee," was not, as a matter of law, intended to be-

come partnership or joint venture property; it was transferred to defendant without any agreement that he would use it in the chicken-raising venture or in any particular way. It was for the jury (if on the pleadings the facts were at issue) to determine whether the money was paid as a cash bond which was misused by defendant in violation of section 405 (see *People* v. *Acree* (1933), 132 Cal.App. 193, 196 [22 P.2d 518]); whether defendant obtained the payments by making false agreements which he intended not to perform, that is, by a "false or fraudulent representation or pretense" within the meaning of section 484 of the Penal Code (see *People* v. *Ashley* (1954), 42 Cal.2d 246, 262-263 [267 P.2d 271]; *People* v. *Weitz* (1954), 42 Cal.2d 338, 343 [267 P.2d 295]); or whether the transaction took some other form, criminal or noncriminal.

Defendant suggests that a conviction of the crime of obtaining money by false pretenses cannot stand because of the provision of section 1110 of the Penal Code that "the defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof is in writing subscribed by or in the handwriting of the defendant, or unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances." The formal requirements of this section are amply met. As to both Count 1 and Count 2 there is in evidence a written contract which constitutes a memorandum of the assertedly false pretense signed by defendant; also both Mr. and Mrs. Bradford and defendant himself testified to the making of the promise which (insofar as this contention of defendant is concerned) we must assume was found to be a false pretense in Count 1, and both Mr. Reinders and defendant himself testified to the making of the promise which likewise (in respect to this contention) we must assume was found to be a false pretense in Count 2.

### Evidence as to Counts 8, 9, and 10

Count 8 charged theft of $1,950 from Cecil R. Dean on or about March 21, 1951; Count 9 charged theft of $2,750 from Dean on or about March 22, 1951; and Count 10 charged theft of $1,500 from Dean on or about April 1, 1951. As previously stated, the jury were unable to agree on a verdict as to Count 8 and found defendant guilty on Counts 9 and 10.

Mr. Dean went to defendant's office in February, 1951, and offered defendant $125 an acre for certain land; defendant

accepted a $50 deposit and undertook to transmit Dean's offer to the owner of the property. Thereafter defendant told Dean that he could not obtain the land which Dean had offered to buy but that he would like to show Dean another, better property. Defendant showed Dean an 80-acre piece of land. On March 21, 1951, Dean told defendant that purchase of the 80 acres would require too much money. Defendant proposed that they each buy 40 acres of the piece and subdivide the property; defendant said that he would drill a joint well and offered to sell the land as subdivision property at a commission of 10 per cent, which was lower than the usual commission. After discussion defendant and Dean agreed to attempt to buy the land for $190 an acre. Dean said that he would go with defendant to talk with the owner of the property; defendant replied that he could transact business better if he went alone to see the owner, whom he described as ''a widow.'' On March 21, 1951, defendant and Dean executed an agreement by which Dean agreed to buy 40 acres of the property for a total price of $7,600, with a down payment of $4,000; Dean gave defendant a check for $1,950 and was credited with the $50 which he had previously deposited. On March 22, 1951, Dean gave defendant another check for $2,750, $2,000 as the balance of his down payment and $750 as his share of the cost of the well. Defendant said he would have the well started in two weeks. No well was drilled on the property.

On April 1, 1951, Dean paid defendant $1,500, with which defendant agreed to build a tract house on the property. No such house was built. Dean believed defendant's various statements and relied on them in parting with his money. Defendant used the money which he received from Dean for his own purposes in his own business.

Dean next saw defendant on May 14, 1951. Dean demanded title to the property. Defendant replied that he could not give Dean title because it was in the name of Mrs. Blackburn, whom defendant described as ''a widow'' and a former employe of defendant. (Mrs. Blackburn was the prosecuting witness as to Counts 3 and 4, dismissed when she became unable to complete her testimony because of illness. As defendant had been notified in December, 1950, and January, 1951, months before his meeting with Dean, Mrs. Blackburn had placed in the hands of her attorney the transactions involving defendant and herself as to this and other property, had taken the position that defendant was dealing illegally with such

674

properties, and had warned him against attempting to deal further with them.) Dean then demanded the return of his money. Defendant said that he did not have the money; he offered Dean an assignment of a certain trust deed, which Dean later received, as security for its repayment. At this time, May 14, 1951, Dean obtained from defendant a writing setting forth the terms of their transactions as follows: "Receipt is acknowledged from Cecil R. Dean" of $4,000 down payment on the described 40 acres. "Total purchase price:" $7,600. "Above sale subject to owner's approval. Receipt is also acknowledged" of $750 "as deposit on well to be drilled, half on the above described property and half on the adjoining forty acres owned by myself" and of $1,500 "deposit for the purchase of building materials for residence to be constructed on the above described property." Thereafter defendant repaid Dean and Dean reassigned the trust deed to defendant.

There is evidence from which it could be found (although, in the state of the record, we cannot hold that it was found [see *infra*, p. 678]) that defendant obtained the payments from Dean by making false promises with intent not to perform them. Defendant had put title to the property which Dean agreed to buy, as well as title to other property, in the name of Mrs. Blackburn; defendant knew that she had turned over to her attorney the matter of defendant's dealings in her name, including the matter of the property which Dean agreed to buy, and the attorney had notified defendant that he had "placed an alert on these titles." Nevertheless, defendant indicated to Dean that he would obtain approval of "the owner" of the property to its sale to Dean. Defendant's financial condition was such that it could be found that he promised Dean to drill a well and erect a house knowing that he probably could not, and intending not to, carry out these promises. Corroboration of Dean's testimony to the false promises could be found in the testimony of defendant himself and in the March 21, 1951, agreement and the May 14, 1951, memorandum signed by defendant.

Defendant asserts that the evidence does not show that he committed any crimes because the Bradfords, the Reinders, and Dean each received back from defendant at least as much as they had paid him. Restoration of property feloniously taken or appropriated is no defense to a charge of theft. (*People* v. *Kay* (1939), 34 Cal.App.2d 691, 696 [94 P.2d 361]; *People* v. *Alba* (1941), 46 Cal.App.2d 859,

866 [117 P.2d 62] ; *People* v. *Costello* (1951), 107 Cal.App.2d
514, 518 [237 P.2d 281].)

*Constitutionality of Sections 402 through 406*
*of the Labor Code*

Defendant urges that sections 402 through 406 of the
Labor Code violate the due process clause of the Fourteenth
Amendment of the federal Constitution and the provision of
section 1 of article I of our state Constitution that "All men
. . . have certain inalienable rights, among which are those
of . . . acquiring, possessing, and protecting property . . . ,"
and that these Labor Code sections cannot be justified under
the police power.

As defendant says, the sections limit the right of con-
tract between employer and employee. However, we agree
with the following reasoning of Presiding Judge Shaw,
speaking for the Appellate Department of the Superior Court
in *People* v. *McEntyre* (1938), 32 Cal.App.2d Supp. 752, 755-
756 [84 P.2d 560], where the constitutionality of the legisla-
tion was upheld against an argument such as that presented
by defendant here: "The right of contract is subject to
regulation and limitation in many of its phases; and there
is special need for such regulation in regard to the relations
between employer and employee. The prospective employer
and the applicant for employment, who is usually dependent
on his own earnings for the support of himself and his
family, do not deal on an equal footing. Especially is this
true in times of depression and widespread unemployment.
Experience has shown, to the extent that it may be regarded
as a matter of common knowledge, that there is great oppor-
tunity for fraudulent practices, embezzlements and other
forms of cheating by employers in the common custom of
requiring employees to deposit so-called 'cash bonds' with
their employers. . . . The usual applicant for employment, in
spite of his supposed freedom of contract, is in no position
to dictate the terms of his contract of employment, or to
insist that it protect him against these possibilities of loss.
The legislature has therefore deemed it necessary to provide
such protection for him, and to that end has enacted that all
deposits put up by him as part of the contract of employment
be deemed bonds and that all such deposits be held intact
as trust funds, and has prohibited any contract to the con-
trary. Considering such facts regarding the matter as are
matters of general knowledge, this legislative conclusion is

obviously one to which reasonable minds might come. It is equally obvious that the legislation enacted in pursuance of that conclusion has a reasonable tendency to abate the evil at which it is aimed. The question whether it should have been adopted is therefore purely one of legislative discretion, not of power, and we may not, if we would, interfere with that exercise of discretion.''

Defendant urges that the legislation is unconstitutionally vague because it does not define ."property put up by any employee or applicant as a bond'' and ''liquidating accounts'' as used in section 405 of the Labor Code.[3] He relies upon *Winters* v. *New York* (1948), 333 U.S. 507, 515 [68 S.Ct. 665, 92 L.Ed. 840], where it is said, ''The standards of certainty in statutes punishing for offenses is [sic] higher than in those depending primarily upon civil sanction for enforcement. . . . There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment.'' The meaning of the expressions challenged by defendant, in their context, is clear to persons of ordinary intelligence, and explicit statutory definition thereof is not necessary.

### Failure to Give Notice of the Specific Charge

■ Notice of the specific charge against defendant is a constitutional right of the accused. (*Cole* v. *Arkansas* (1948), 333 U.S. 196, 201 [68 S.Ct. 514, 92 L.Ed. 644]; *People* v. *Mahony* (1904), 145 Cal. 104, 106-107 [78 P. 354].) As previously stated, defendant was charged with ''Grand Theft''; the jury were instructed and the People urge that under this charge he can be convicted of violation of section 405 of the Labor Code, quoted *supra*, page 667, footnote 1. According to the People, ''It was not incumbent upon the prosecution to say that the particular type of theft was the theft denounced in the Labor Code, the Penal Code or any particular code.'' The People cite the provision of section 950 of the Penal Code, as it read prior to its amendment in 1951, that ''The indictment or information must contain: . . . 2. A statement of the acts constituting the offense, in ordinary and concise language, and in such manner as to enable a

---

[3]Section 405 of the Labor Code, as previously stated, provides in part, ''Any property put up by any employee or applicant as a bond shall not be used for any purpose other than liquidating accounts between the employer and employee or for return to the employee or applicant and shall be held in trust for this purpose and not mingled with the property of the employer. . . .''

person of common understanding to know what is intended.'' Section 950 now provides, ''The accusatory pleading must contain: . . . 2. A statement of the public offense or offenses charged therein.'' The People also cite the provision of section 952 of the Penal Code that ''In charging theft it shall be sufficient to allege that the defendant unlawfully took the labor or property of another.'' The last quoted sentence was added to section 952 by amendment in 1927.

Under the last quoted provision of section 952, it has been said, ''it was not necessary for the information to allege the particular type of theft involved, such as false pretenses, embezzlement, or larceny by trick and device. (*People* v. *Fewkes* [1931], 214 Cal. 142, 149 [4 P.2d 538].)'' (*People* v. *Nor Woods* (1951), 37 Cal.2d 584, 586 [233 P.2d 897].) In the Fewkes and Nor Woods cases the thefts were either false pretenses, larceny by trick and device, or embezzlement, all offenses covered by the Penal Code; those cases do not concern the charging of a violation of section 405 of the Labor Code.

The provision of section 405 of the Labor Code that any employer who misuses property put up by an employe as a bond ''is guilty of theft and shall be punished in accordance with the provisions of the Penal Code relating to theft'' is based upon the provision of former Stats. 1929, chapter 559, page 962, that any employer who misuses such property ''shall be guilty of theft and shall be punished, upon conviction thereof, in accordance with the provisions of sections 486, 487, 488, 489 and 490 of the Penal Code.'' The last mentioned sections of the Penal Code (486 [degrees of theft], 487 [defining grand theft], 488 [defining petty theft], 489 [punishment of grand theft], 490 [punishment of petty theft]), together with sections 484 [defining theft] and 485 [defining theft of lost property] had been amended in 1927 by Stats. 1927, chapter 619, pages 1046-1047. By such 1927 amendment the word ''theft'' was substituted for the former word ''larceny'' in the statutes and the former definition of ''larceny'' in section 484 was replaced by a more elaborate definition of ''theft'' which expressly included not only the elements of larceny but also those of embezzlement and obtaining money by false pretenses; also this 1927 amendment added section 490a of the Penal Code, which provides, ''Wherever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing,

said law or statutes shall hereafter be read and interpreted as if the word 'theft' were substituted therefor." Concerning the 1927 amendment it is said in *People* v. *Myers* (1929), 206 Cal. 480, 484 [275 P. 219], "The amendment to section 484, in connection with the other cognate legislation such as the amendments to sections 951[4] and 952[5] of the Penal Code (Stats. 1927, p. 1043), is designed not only to simplify procedure but also to relieve the courts from difficult questions arising from the contention that the evidence shows the commission of some other of these crimes than the one alleged in the indictment or information, a contention upon which defendants may escape just conviction solely because of the border line distinction existing between these various crimes [i.e., crimes described in the Penal Code]."

We do not believe that the Legislature meant to go so far, when in 1929 it enacted the statute, not a part of the Penal Code, which described misuse by an employer of money put up by an employe as a bond as "theft" punishable "in accordance with the provisions of sections 486, 487, 488, 489 and 490 of the Penal Code" (Stats. 1929, ch. 559, p. 962), as to make such offense chargeable simply as "theft." Nor do we believe that the indictment's specific charge of theft by violation of subdivision 1 of section 487 of the Penal Code is sufficient to give the defendant notice that he is charged with a violation of the Labor Code. When a defendant is accused of "grand theft" by an indictment which expressly refers to the Penal Code, it cannot fairly be said that he has notice of and should be prepared to defend against accusations that he violated statutory provisions contained in other codes.

The convictions of Counts 1 and 2, the counts involving the Bradfords and the Reinders, which the attorney general seeks to uphold under section 405 of the Labor Code, must be reversed because defendant was not charged with violation of such section. The convictions of Counts 9 and 10, the counts involving Dean, must be reversed because it is impossible in the state of the record to determine whether such convictions were based upon a permissible view of the evidence

---

[4]Section 951, which concerns the form of indictment or information, was amended by Stats. 1927, ch. 613, p. 1043, in respects not particularly relevant here.

[5]As previously indicated (*supra*, p. 677), by the 1927 amendment of section 952 (Stats. 1927, ch. 612, p. 1043) there was added the provision that "In charging theft it shall be sufficient to allege that the defendant unlawfully took the labor or property of another."

or upon a confusion which led the jury improperly to believe that the alleged offenses against Dean were violations of the Labor Code.

For the reasons above stated, the order denying defendant's motion for a new trial is reversed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.