Filed 4/1/16  King v. Universal Protection Service CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| ARLENE KING, | B264643 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC498406) |
| v. | |
| UNIVERSAL PROTECTION SERVICE, LP, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County. Elihu M. Berle, Judge.  Affirmed.


Law Offices of Kirk D. Hanson and Kirk D. Hanson, for Plaintiff and Appellant.


Sheppard Mullin Richter & Hampton, Richard J. Simmons, Jason W. Kearnaghan and Cassidy M. English, for Defendant and Respondent.


_____

Arlene King filed an action for civil penalties against her former employer, Universal Protection Service, LP, pursuant to the Labor Code Private Attorneys General Act of 2004 (PAGA).[1]  King's PAGA claims alleged that Universal had violated various sections of the Labor Code in the manner in which it collected, banked and refunded security deposits that employees paid for their company-issued uniforms.  The trial court granted Universal's motion for summary judgment (MSJ).  We affirm the ensuing judgment entered on the order granting the MSJ.

## FACTS

*Universal's Former Practices for Security Deposits for Company-Issued Uniforms* [2]

At all relevant times, Universal provided its employees with uniforms, except for socks, shoes and belts.  Universal required full-time employees to pay a $300 security deposit for their uniforms at the time they were hired.  An employee could satisfy the security deposit for his or her uniforms in one of two ways:  (1) pay the full $300 up front, or (2) sign the company's standard-form "promissory note" authorizing Universal to deduct $30 from each paycheck until the $300 security deposit was satisfied.  King signed such a promissory note.  The note stated that the funds deducted from her paycheck would be "separately tracked and held as a bond in a trust account for [her] benefit," and that interest would "accrue on [her] deposit."[3]

Universal maintained a trust checking and savings account with Chase Bank that collectively held all of its employees' security deposits for their uniforms.  Universal refers to this as the "FBO account," which apparently means "for the benefit of."

---

[1]     See Labor Code section 2698 et seq.  All further undesignated section references are to the Labor Code.

[2]     In early 2013, shortly after King filed her current action, Universal stopped its practice of requiring its employees to pay security deposits for their uniforms.

[3]     According to Universal's evidence in support of its MSJ, which was not disputed, employees received accrued interest on their security deposit for their uniforms at a rate of 1.25 percent per annum, calculated from the date of each uniform deposit deduction taken from their paycheck to the date a refund was processed.

Universal maintained the FBO account solely for the purpose of holding and refunding employee uniform security deposits, and maintained the account separately from its normal payroll account. At no time did the company commingle other company funds in the FBO account.

When an employee resigned or was terminated, and returned all uniform items in "serviceable condition," Universal refunded the employee's entire security deposit with interest. At an employee's selection, he or she could return his or her uniform items at different locations, including at Universal's main office, a regional office, or at the employee's "post."

The standard-form promissory note signed by King and other employees stated that Universal would "process" a refund of an employee's security deposit for his or her uniforms "as soon as possible" once the company "documented" that an employee had returned the uniforms, "but not later than [30] days from receipt of [the] uniforms." To accomplish the documentation of the return or receipt of an employee's uniforms, Universal required both the employee and a company representative to sign a document entitled "Uniform/Equipment Control Report" (hereafter the Uniform Report). King and a Universal representative signed such a Uniform Report. King signed a Uniform Report form on July 3, 2012, and a Universal representative signed the form on July 12, 2012.

When Universal refunded an employee's security deposit for his or her uniforms, a check was paid to the employee from the FBO account and not from Universal's payroll account.

### Universal Employs King

On November 8, 2010, Universal hired King as a security guard. She began work on February 7, 2011. On November 16, 2010, King attended a new employee orientation. During the orientation, a human resources representative explained Universal's uniform policy and the security deposit deduction process, and King signed Universal's standard-form promissory note authorizing the company to deduct $30 from her paychecks to satisfy the $300 uniform security deposit. Prior to beginning work, Universal issued King the following uniform items: three pairs of pants, six shirts, one

3

"bomber" style jacket, and a badge. Universal thereafter issued a paycheck to King every two weeks; the company deducted $30 for her uniform security deposit payment each pay period. Universal deducted $30 from King's first ten paychecks dated: February 17, 2011, March 3, 2011, March 17, 2011, March 31, 2011, April 14, 2011, April 28, 2011, May 12, 2011, May 26, 2011, June 9, 2011, and June 23, 2011. No further security deposit funds for uniforms were deducted from King's paychecks after June 23, 2011.

On June 16, 2012, King notified her "watch commander" that she was quitting her job. On June 18, 2012, King signed a resignation notice and picked up her final paycheck. Following her resignation in mid-June 2012, King returned her uniform items on two dates: on July 3, 2012, she returned the bulk of her uniform items; on July 5, 2012, she returned the remaining items. On July 3, 2012, when she returned the bulk of her uniform items, King signed a Uniform Report form. On July 12, 2012, a representative from Universal also signed the Uniform Report form indicating that King's uniforms had been received.

On July 13, 2012, Universal delivered a check (no. 5196) to King for $304.62, representing all of her $300 deposit, plus interest. The check was issued from the FBO account noted above. King cashed her security deposit refund check on July 16, 2012.

***The Litigation***

In December 2012, King filed her current action against Universal. Following proceedings on the issue of whether certain of King's claims were subject to arbitration,[4] the trial court agreed to dismiss King's class action claims at her request, with leave to pursue her PAGA representative claims only.

In January 2015, King filed her operative first amended complaint (FAC). The FAC alleged the following PAGA causes of action respectively: (1) violations of the statutes governing employee security deposits (§§ sections 400-410); (2) untimely payment of wages (§ 204); (3) illegal wage deductions (§ section 221); (4) secret

---

[4]    Essentially, the trial court ruled that King's class action claims were subject to arbitration under an arbitration agreement in her employment contract.

4

payment of lower wages (§ 223); (5) illegal deductions from wages (§ 224); and (6) failure to provide accurate wage statements (§ 226). King expressly alleged that all of her claims were brought as representative claims under the PAGA.

Universal filed a MSJ or, in the alterative, motion for summary adjudication of each of King's causes of action.[5] King thereafter filed opposition papers. On March 19, 2015, the trial court granted Universal's MSJ, finding as follows: King's claims in her first cause of action based on section 403 failed as a matter of law because (1) Universal and its employees entered a written agreement (namely, the promissory note) setting forth the conditions under which uniform security deposits were given, (2) the uniform security deposits were deposited into an account at a bank authorized to do business in California, and (3) the uniform security deposits were withdrawn from the account only upon the joint signatures of the employer and the employee.

Further, the trial court ruled that King's claims in her first cause of action based on section 404 failed as a matter of law because (1) the uniform security deposit funds were held in a separate account established for the benefit of the employees, and used solely for the purpose of holding and refunding employee uniform security deposits, not accessible for any other purpose, and not subject to enforcement of a money judgment except in an action between the employer and the employee, and (2) the uniform security deposits plus interest were returned to the employee upon the fulfillment of an agreement in substantial compliance with the security deposit statutes.

The trial court ruled that King's second through sixth causes of action failed as a matter of law because they were derivative of the first cause of action concerning the manner in which Universal collected, banked and refunded employee-paid security deposits for their uniforms.

---

[5] Universal actually filed its MSJ in October 2014, as to King's original pleading. In January 2015, the trial court requested further briefing with respect to certain issues and set a continued hearing date for the MSJ in March 2015. At the same time, the court granted King's motion for leave to file her FAC, and permitted the parties to address the new and or clarified allegations set forth in the FAC by way of supplemental briefing on Universal's MSJ.

Additionally, the trial court dismissed King's claim under section 405, as set forth in the first cause of action, with prejudice pursuant to the parties' stipulation, which King confirmed, that she was no longer pursuing such a claim.

On May 18, 2015, the trial court entered judgment in favor of Universal on its MSJ. King filed a timely appeal.

## DISCUSSION

### I. Standards of Review

"On appeal from a summary judgment, our task is to independently determine whether an issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law. [Citation.] 'We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. Essentially, we assume the role of the trial court and apply the same rules and standards.' [Citation.] We apply the same three-step analysis required of the trial court. First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond. Second, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in the moving party's favor. When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable issue of material fact. [Citations.] In so doing, we liberally construe the opposing party's evidence, strictly construe the moving party's evidence, and resolve all doubts in favor of the opposing party. [Citations.]" (*Hutton v. Fidelity National Title Company* (2013) 213 Cal.App.4th 486, 493-494.)

We likewise review de novo questions of statutory construction. (*Weingarten Realty Investors v. Chiang* (2012) 212 Cal.App.4th 163, 167-168.) "[W]e begin with the fundamental rule that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, the court turns first to the words themselves for the answer. We are required to give effect to statutes according to the usual, ordinary import of the language employed in framing them. Moreover, the various parts of a statutory enactment must be harmonized by considering the particular

6

clause or section in the context of the statutory framework as a whole." (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 505.)

## II.     The Governing Labor Code Sections and Associated Regulations

In 1937, as part of the act establishing the Labor Code (see Stats. 1937, ch. 90, p. 185), the Legislature enacted a series of statutes governing the employer-employee relationship when an employer issues equipment, tools or uniforms to an employee for use in his or her day-to-day workplace duties.  These statutes were enacted with the recognition that employers and employees "'do not deal on an equal footing,'" and "'that there is great opportunity for fraudulent practices, embezzlements and other forms of cheating by employers in the common custom of requiring employees to deposit so-called "cash bonds" . . .  '" for employer-issued equipment, tools or uniforms.  (See *People v. Pond* (1955) 44 Cal.2d 665, 675.)

Three of the employee-paid security deposit statutes noted above are implicated in King's current PAGA case.  First, section 402, provides as follows as relevant to King's case:

>    "No employer shall demand, exact, or accept any cash bond from any employee or applicant unless:
>
>    "(a)  The employee or applicant is entrusted with property of an equivalent value . . . ."

We see nothing in the record to suggest that there is any dispute that $300 represented a fair valuation of the uniform items that Universal issued to King at the time of her hiring.

Next in line, section 403 reads in full:

>    "If cash is received as a bond it shall be deposited in a savings account in a bank authorized to do business in this State, *and may be withdrawn only upon the joint signatures of the employer and the employee or applicant.*

7

"Cash put up as a bond shall be accompanied by an agreement in writing made by the employer and employee or applicant, setting forth the conditions under which the bond is given." (Italics added.)

Third, section 404 provides:

"Any money put up as a bond under [section 403]:

"(a) Is not subject to enforcement of a money judgment except in an action between the employer and the employee or applicant . . . .

"(b) Shall be returned to the employee or applicant together with accrued interest thereon, *immediately upon the return* of the . . . property entrusted to the employee . . . *and upon the fulfillment of the [bond] agreement*, subject only to the deduction necessary to balance accounts between the employer and employee or applicant." (Italics added.)

The California Industrial Welfare Commission promulgated Wage Order 4-2001, governing employee uniforms. This wage order is now found in part nine of California Code of Regulations, title 8, section 11040 (hereafter IWC section 11040). IWC section 11040 provides:

"(A) When uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer. . . .

"(C) A reasonable deposit may be required as security for the return of the items furnished by the employer under provisions of subsection[] (A) . . . of this section upon issuance of a receipt to the employee for such deposit. Such deposits shall be made pursuant to Section 400 and following of the Labor Code or an employer with the prior written authorization of the employee may deduct from the employee's last check the cost of an item furnished pursuant to (A) . . . above in the event said item is not returned. No deduction shall be made at any time for normal

8

wear and tear.  All items furnished by the employer shall be returned by the employee upon completion of the job.”

### III.    Section 403

King contends summary judgment in favor of Universal must be reversed because the trial court erred insofar as she alleged—as a representative for the interests of our state labor law enforcement agencies (see *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 387)—that the company violated section 403 in the manner in which it collected and banked the employees’ security deposits for their uniforms. King argues that Universal violated the law because it did not hold its employees’ security deposits for their uniforms in a bank account *with an account restriction* providing that the funds could be withdrawn “only upon the joint signatures of the employer and the employee.”  In other words, King argues Universal violated section 403 by the way it set up the FBO account.  Specifically, that the company did not set up the FBO account with Chase Bank so that the bank would not allow any withdrawal from the account without obtaining signatures from both an employee and from Universal authorizing the bank to dispense the money.  As stated by King:  “When the employer complies with [section] 403, the mechanics of [section] 403 protect the employee from unfair or fraudulent withdrawals of the employee’s cash bond by giving the employee the power to refuse to sign [with the bank] for the withdrawal.  This power allows the employee to effectively freeze his or her cash bond deposit in the account pending the resolution of any dispute between the employee and employer over the employee’s deposit.”

At no time in the trial court or on appeal has King asserted that Universal actually wrongfully withheld any part of her uniform security deposit.  In fact, the evidence is undisputed that Universal refunded King’s security deposit in full, with interest.  Instead, King argues that, “*had* Universal determined to deduct [money] from the deposit associated with [her] uniform, Ms. King would have had no ability to protect her deposit by refusing to provide her joint signature for withdrawal.”  (Italics added.)  Thus, King’s section 403 claim is based on the manner that Universal set up the FBO account, not with

9

any actual alleged withdrawal wrongdoing associated with the account. Implicitly, she seeks the applicable, prescribed PAGA civil penalty for each employee whose uniform security deposit was placed into the "wrong" type of account, regardless of whether any part of any employee's security deposit was wrongly withheld or not.

We find the trial court did not err in granting summary judgment on King's claims based on section 403.

*Analysis*

King's arguments, boiled down to their essence, ultimately propose that there is only one reasonable interpretation that may be given to the first paragraph of section 403, which, she says, is something to the effect of the following:

> "If cash is received as a bond it shall be deposited in a savings account in a bank authorized to do business in this State, *which account shall have an account restriction providing that funds may be withdrawn from the account only upon the presentation to the bank of joint signatures of the employer and the employee or applicant.*"

As noted above, the first paragraph of section 403 actually reads as follows:

> "If cash is received as a bond it shall be deposited in a savings account in a bank authorized to do business in this State, *and may be withdrawn only upon the joint signatures of the employer and the employee or applicant.*"

We find no error in the trial court's decision to grant Universal's MSJ because the undisputed evidence established that both King and Universal signed the Uniform Report at about the time she returned her uniform items, and that this was the same practice as to all employees. Further, the undisputed evidence established that the use of the Uniform Report initiated Universal's processing of a refund of an employee's security deposit for his or her returned uniforms. That is, to initiate the process of collecting and inspecting the employee's returned uniforms, and then to calculate the amount of the refund and

10

accrued interest, so that funds could be withdrawn from the FBO account to pay the refund.

Applying the predicate facts summarized above, we find the trial court correctly ruled that Universal's practices related to the manner in which it held King's security deposit (and all employees' security deposits) satisfied section 403's "joint signature" requirement. Section 403 does not explicitly command that an employer must set up an account to hold an employee's security deposit with an account restriction requiring that two signatures be presented to the bank before any withdrawal may be made from the account (assuming that any bank would even agree to set up such an account as to every employee of a company). Instead, section 403 requires that a withdrawal from a bank account holding an employee's security deposit may be made only "*upon the joint signatures of the employer and the employee . . . .*" It is reasonable to interpret section 403, as did the trial court, to require that an employer and employee must both agree in writing, that is, give their signatures, to a withdrawal from an account holding an employee's security deposit. This does not mean setting up an account that requires presentation of joint signatures to the stakeholder bank. An interpretation that both parties must put in writing that they agree to a withdrawal is far more workable and practicable than the interpretation proffered by King.

We do not read the language in section 403 to mandate that an employer must set up a bank account for each employee, which would receive money for only one purpose, namely, to hold the employee's security deposit, and which account would have a restriction precluding the bank from processing a withdrawal from the account without obtaining a signature from the employee and the employer, and which account would be emptied and closed when the employee left his or her job.[6] The first paragraph of section 403 is composed of one sentence with two parts. The first part of the sentence states that

---

[6] With a straight savings account, King essentially argues that the bank must be presented with a withdrawal slip with two signatures; with a savings and checking account, the bank will only pay on a check with two signatures. Of course, in either scenario it cannot be ignored that what is happening is the liquidation and closing of the account to fund the employee's refund.

11

employee security deposits "shall be deposited in a savings account." The second part of sentence comprising the first paragraph of section 403, which is separated from the first part of the sentence by a comma, states that funds put into an account for a security deposit "may be withdrawn only upon the joint signatures of the employer and the employee or applicant." This part of the sentence does not state that a withdrawal may only be made by presentation to the stakeholder bank of joint signatures of the employer and employee. We find the trial court reasonably interpreted this joint signature requirement to find that it was satisfied in the relationship between King and Universal when both signed the Uniform Report.

The interpretation we offer above fits within the overall aspects of section 403, including the second paragraph of the section. This second paragraph states that any cash which is put up as a bond "shall be accompanied by an agreement in writing made by the employer and employee or applicant, setting forth the conditions under which the bond is given." Thus, what is critical in the employee-paid security deposit context is not the type of account used, but instead it is the arrangements for the conditions under which the bond is given. Where, has here, there are documentary arrangements, we will not impose further arrangements not explicitly commanded by section 403.

King has not cited any case to support the proposition that section 403 requires that an employee's security deposit must be held in an account with a restriction requiring the presentation of two signatures to the stakeholder bank for a withdrawal. To be fair, Universal has not cited any case to support the proposition that such an account is not required by section 403. In our independent research, we have not found a case directly addressing what is required by section 403. This said, we agree with Universal's observation that, had the Legislature intended to impose the type of economic and administrative costs and coordination that would be needed to open an account in the names of both an employer and employee with an account restriction requiring two signatures for a withdrawal, it knew how to say as much, and could have and would have stated as much in the governing statutes had that been intended.

Further, King's proffered interpretation is necessarily founded on the predicate that there are banks, or even a bank, in California that would agree to set up an account to hold a one-time, minimal dollar deposit (here, a total amount of $300) which would be liquidated and closed at the end of a person's employment. In this vein, it may also be questioned whether any bank would want to become a stakeholder of funds which would potentially place the bank in the unenviable position of being placed in the middle in the event of a dispute between an employee and employer over the amount of refund to be withdrawn from the account.

We understand King's argument that she would have had the greatest protection over her security deposit in the event of a dispute with Universal over the amount of her refund if she had been given the ability to "freeze" a bank account holding her security deposit by withholding her signature from the bank, pending resolution of the dispute. This said, our interpretation of section 403 discussed above does not leave an employee without any protection over his or her security deposit. King had the ability to freeze Universal from withdrawing funds from the FBO account by withholding her signature from the Uniform Report. Granted, Universal could have simply withdrawn money in any event, but this would have left the company pristinely open to civil penalties for a violation of section 403. In the end, we are satisfied that King's interpretation of section 403 is not supported by the statute's language, and would create administrative and economic costs and difficulties not intended by the Legislature.

The trial court correctly decided the section 403 issues presented by King's current PAGA action in favor of Universal.

## IV.    Subdivision (a) of Section 404

King next contends summary judgment in favor of Universal must be reversed because the trial court erred insofar as she alleged the company violated section 404, subdivision (a) (hereafter section 404(a)). King argues that the promissory note for her security deposit for uniforms that Universal required her (and other employees) to sign at the start of employment violated section 404(a). We see no error.

13

King challenges the following provisions included in the promissory note:

"Further, I understand and agree that failure to return my uniforms within 180 days of my last day worked will be considered abandonment of my deposit and *I hereby authorize the Company to liquidate the bond without further legal proceedings.*

"If payment of his indebtedness evidenced by this note, any part thereof, shall not be made when due, *the employee authorizes and empowers any attorney of record of any court of record within the United States of America to appear for the employee in any court, or before any clerk thereof, and waive the issue and service of process and confess judgment against the employee in favor of Universal Protection Service for the amount then due*, the costs of suit, reasonable attorney's fees and reasonable related expenses, herby waiving and releasing all rights of exemption, appeal and stay of execution." (Italics added.)[7]

King's argument that the promissory note violated section 404(a) once again rests on her interpretation of the subdivision's statutory language. She proposes that section 404(a) is susceptible to only one interpretation—that an employee's security deposit for employer-issued property is "exempt from a money judgment [*sic*] in favor of Universal, except a money judgment obtained through a lawsuit between Universal and the employee." The remainder of King's arguments demonstrate that what she is actually proposing is something akin to this: section 404(a) prohibits any form of "self-help" by an employer to take control of an employee's security deposit, thus rendering Universal's promissory note unlawful under the section. Restating King's argument, she interprets section 404(a) to mean that, once an employee pays a security deposit for employer-

---

[7] The second paragraph of the promissory note reproduced above plainly is limited in application to the situation where an employee receives his or her uniform items, then quits working before he or she had paid the entire $300 security deposit. In this scenario, the promissory note would allow Universal to obtain a judgment for the unpaid amount of the security deposit.

issued property, including uniforms, and the money is placed into an account at a bank (see § 403, discussed *ante*), the only lawful way for an employer to take control of the money in the account in the event the employee does not return his or her uniforms is for the employer to file a lawsuit, obtain a judicial money judgment, and then go through the procedures for enforcing the judgment against the account. Again, we conclude that King is proposing processes that are not required under the statutory law.

Section 404(a) states that money put up by an employee and placed in a security deposit account "[i]s not subject to enforcement of a money judgment *except in an action between the employer and the employee or applicant . . . .*" By its express, plain language, subdivision (a) applies only to "money judgments." Subdivision (a) bars any third-party from trying to enforce a money judgment by executing a writ of execution against money being held in a security deposit account. In short, the money held in a security deposit account will—at some point in time—belong either to the employer or to the employee, but never to anyone else seeking to assert a claim against the money. If an employer obtains a money judgment in an action against an employee on whatever type of claim, then the employer may seek to enforce the judgment against the money in a security deposit account. We find this does not mean that the employer has no other available recourse against a security deposit in an account aside from a lawsuit and a money judgment.

Apart from the money judgment issue, section 404(a) does not prescribe nor prohibit any particular procedures for accessing the funds in a bank account holding an employee's security deposit. Further, the remainder of the section 404 does not justify King's position that funds in a bank account holding an employee's security deposit may only be accessed by the filing of a court action and the ultimate issuance of a money judgment. Section 404, subdivision (b), states that an employee's security deposit shall be returned to the employee "*subject only to the deduction necessary to balance accounts between the employer and employee or applicant.*" Thus, section 404 contemplates that allowing for "deductions" to "balance accounts" is permitted without the intervention of our state's courts. This, of course, comports with the very concept of a security deposit:

15

one party asks another party to post a deposit so that, in the event the latter runs off, the former has recourse for any loss. King's interpretation of section 404(a) would put an end to the very concept of a security deposit, requiring lawsuits to effectuate any balancing between the security depositor and the person for whose protection the deposit is given. We see no reason that, when an employee fails to return an employer's equipment or uniforms, an employer should be denied such a first measure recourse as looking to a security deposit without requiring the employer to file a court action. Finally, it cannot be ignored that allowing recourse to a security deposit may have benefits for our state's courts, alleviating the need for lawsuits through a security deposit arrangement agreed to by the employer and employee.

We reject King's reliance on *Barnhill v. Robert Saunders & Co.* (1980) 125 Cal.App.3d 1 (*Barnhill*) for a different result. In *Barnhill*, an employer loaned $587.50 to an employee and the employee signed a promissory note. Later, the parties orally agreed that the employer would deduct $37.50 from the employee's wages every two weeks until the debt was paid. The employer discharged the employee for reasons unrelated to the note, at which time the employee still owed $475 on the note. After discharging the employee, the employer deducted the remaining balance on the loan *from the employee's final wages*. (*Id*. at p. 3.) The Labor Commissioner ordered the employer to pay the employee her final wages, and to recover on the note separately. The employer sought review in the trial court, and the court entered judgment in favor of the employee for the $475 pursuant to section 201, plus penalties pursuant to section 203. The employer filed an appeal. The Court of Appeal held that an employer may not lawfully set off an employee's debt against the final wages due to the employee upon his or her discharge given the statutory duty imposed on an employer to pay an employee his or her final pay as prescribed in section 201. (*Id*. at pp. 4-6.)

The holding in *Barnhill* under section 201 has no relevance in King's current case. Her case involves an employee's security deposit for uniforms as governed by sections 401 through 406. There is no debt involved in King's current case. Her action did not allege, and she did not present evidence showing, that Universal withheld any of her final

16

wages due to her upon her resignation. Further, King has never disputed that she received a full refund of her $300 deposit, plus accrued interest.

## V.     Subdivision (b) of Section 404

King further argues summary judgment in favor of Universal must be reversed because the trial court erred insofar as her case involves section 404, subdivision (b) (hereafter section 404(b)). King claims that Universal failed to return her security deposit "immediately" after she returned her uniforms, as required by section 404(b). She argues that she presented evidence showing it was Universal's practice to delay returning an employee's security deposit for seven or eight days. Also, that in her case, she waited eight days for her security deposit. Based on this, King argues the trial court erred in finding no violation of section 404(b)'s immediacy requirement in that the term "immediately" cannot reasonably be interpreted to mean "within seven-to-eight days." King's arguments suggest that she wants us to interpret section 404(b) to mean that an employer must refund a security deposit at the same time an employee returns his or her employer-issued equipment or uniforms, in some form of closing exchange. Again, we find the trial court did not err in rejecting such an interpretation.

King is correct, of course, that words in statutes must be given their plain and common sense meaning. (*Murphy v. Kenneth Cole Productions, Inc*. (2007) 40 Cal.4th 1094, 1103.) Applying this maxim, she argues that the word "immediately" is defined in Black's Law Dictionary to mean "occurring without delay; instant." Further, she argues that section 404(b) would operate in coordination with section 403, "in the real world," were it defined to require the "instant" return of an employee's security deposit. She offers this scenario: In the event Universal showed up at an arranged instantaneous exchange of uniforms for security deposit, but only brought part of the employee's security deposit, claiming some form of offset was proper, the employee could protect his security deposit by refusing to provide his joint signature for a withdrawal from the security deposit account as stated in section 403. The problem we see with King's hypothetical is that she is looking at this issue in only one direction.

The undisputed evidence in the record established that, once an employee returned his or her uniforms, Universal would inspect the uniform for damage, obtain signatures on the Uniform Report from both the employee and Universal, and process the security deposit refund check, with the correct interest. Given the logistics of coordinating the return of the uniforms, the inspection, and the processing of the refund with interest check, it is reasonable to interpret section 404(b)'s command that an employer refund a security deposit "immediately" to mean "as immediately as practicable." This interpretation takes into account not only the realities of processing a refund check, it also serves the interests and convenience of the employee. If a short, here one week, time between a return of an employee's uniforms and the delivery of the refund check were eliminated in favor of an instantaneous, "refund-on-the-same day" requirement, it would likely require Universal to adopt stricter rules for the return of uniforms, disallowing all employees from leaving their uniforms at their post, or a regional office, or returning their uniforms by mail, or through a friend, co-worker or family member. Further, no interpretation of section 404(b) would be reasonable if it disallowed the company the time to inspect the returned uniforms for damages or for failure to return all items that were issued. In King's case, for example, she returned her uniform items without any advance warning, approximately two weeks after her last day of work, on two separate days. Her arguments on appeal do not explain how it is that Universal should have been standing at the ready, with a refund check to exchange, at the point of return.

Given simple logistics, "immediately" as used in section 404(b) should not be given the unreasonable interpretation of "instantly," as King proffers. The immediate payment of final wages as required under section 201 does not translate to the refund of security deposits for equipment, tools or uniforms. Moreover, employers are typically aware ahead of time when an employee leaves his work, either by the employer's decision to effect a termination or by the employee's notice, and the employer has advance notice to process the employee's final paycheck. This is not also necessarily true for the return of property which has to be inspected. Where, as in King's case, she waited almost two weeks after her last work day to return her uniform items, where she

18

did so in two separate trips two days apart, and where she received her refund just eight days later, allowing time for inspection of the property and the processing of the refund check, with interest, we are satisfied that the trial court reasonably interpreted the timing of the refund not to violate section 404(b).

## VI. Sections 204, 221, 223, 224 and 226

King last contends summary judgment in favor of Universal must be reversed because the trial court erred in ruling that her claims under sections 204, 221, 223, 224 and 226 were derivative of her claims under sections 403 and 404. We disagree.

King's operative pleading did not allege, and the evidence presented did not show, any failure by Universal to pay semi-monthly wages (§ 204), or that the company tried to collect previously paid wages (§ 221), or that it paid less than the statutory or contractual wage scale (§ 223), or that it made unauthorized deductions from its employees' wages (§ 224), or that it failed to provide itemized pay stubs to its employees (§ 226). Every claim in King's PAGA action was based on her claim that Universal acted wrongly in the manner in which it collected, banked and refunded employee security deposits. We see no error in the trial court's ruling that King's claims under sections 204, 221, 223, 224 and 226 were derivative of her claims under sections 403 and 404.

## VII. Alternate Grounds for Affirming the MSJ

Universal argues that, if any ground discussed above were not proper for granting its MSJ, then the order granting its MSJ should be affirmed on the alternate ground that (1) King's claims were time-barred and that (2) King was not an aggrieved employee because she received a full refund of her security deposit with interest. Because we have affirmed the trial court's judgment on the grounds on which the court relied, we do not reach Universal's alternative arguments.

19

## DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.


BIGELOW, P.J.

We concur:


RUBIN, J.


GRIMES, J.