Filed 6/6/24  P. v. Nivarez CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REBECA NIVAREZ,<br><br>    Defendant and Appellant. | G062187<br><br>(Super. Ct. No. 06CF0633)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Jonathan S. Fish, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christine Y. Friedman and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

In 2011, a jury convicted Rebeca Nivarez of first degree murder and second degree robbery. In 2020, Nivarez filed a petition to vacate the murder conviction and to be resentenced. (Pen. Code, § 1172.6.)[1] In 2022, the trial court issued an order to show cause and conducted an evidentiary hearing by reviewing the 2011 trial transcripts. The court found beyond a reasonable doubt that Nivarez was guilty of first degree murder as an aider and abettor and denied Nivarez's section 1172.6 petition.

On appeal, Nivarez argues that the court's ruling was not supported by substantial evidence. We disagree and affirm the trial court's order.

I

FACTS AND PROCEDURAL BACKGROUND

At the section 1172.6 evidentiary hearing the parties relied solely on the transcripts from the original jury trial. Therefore, we will take the facts from Nivarez's direct appeal and will augment as needed in the discussion section of this opinion:

"The victim, Mario Rodriguez Hernandez, sold jewelry to clients at their homes by appointment. He carried the jewelry in a briefcase.

"On March 18, 2005,[2] Hernandez left his home in the morning and did not return for lunch, which was unusual.

"Around 3:30 that afternoon, defendant pawned $2,500 worth of jewelry.

"That evening, Hernandez had still not returned home. His granddaughter obtained from the phone company a list of Hernandez's last cell phone calls. She phoned

---

[1] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10); all further undesignated statutory references are to the Penal Code.

[2] "All dates refer to the year 2005 unless otherwise specified." (*People v. Nivarez* (Nov. 19, 2012, G045230 [nonpub. opn.].)

2

the last phone number Hernandez had called on March 18.  Defendant answered the call.  Defendant told the granddaughter that Hernandez had come by around 7:00 a.m. on March 18 to pick up $20 she owed him for a pair of earrings.[3]

"On March 19, the granddaughter informed the police of her communication with defendant.  An officer contacted defendant.  Defendant told the officer that Hernandez had phoned her between 7:00 a.m. and 7:30 a.m. to say he was on his way for an 8:00 a.m. appointment with her, but never showed up.

"Also on March 19, defendant went to her daughter's apartment and gave the daughter a bag of jewelry to hold for a few days.  Defendant said she did not want to leave the jewelry at her own house.  Defendant said the jewelry was worth about $4,000 and she had bought it in Los Angeles because she planned to start selling jewelry again.  Defendant told her daughter not to tell anyone about the jewelry.

"Defendant's daughter asked defendant if defendant's boyfriend had killed Hernandez.  Defendant told the daughter not to phone her and ask anything about the missing person because defendant believed the police were tapping her phone and listening to her conversations.

"Defendant's son, Ricardo Diaz, lived in her garage.[4]  Defendant's friend and housemate, Lilia Avila, last saw Ricardo on March 23 or 24.  Defendant told Avila that Ricardo had gone to Colorado to meet a girlfriend.

"Before defendant retrieved the jewelry from her daughter, the daughter removed a pair of earrings from the bag.  When defendant later took back the jewelry, she asked the daughter for Mapquest directions to Colorado.  Defendant said she was

---

[3] "The granddaughter testified to this information at the trial.  Prior to the trial, however, she told the police that defendant told her that Hernandez never showed up for the morning appointment."  (*People v. Nivarez*, *supra*, G045230.)

[4] "Because defendant's daughter also has the last name Diaz, we refer to the son in this opinion by his first name, Ricardo."  (*People v. Nivarez*, *supra*, G045230.)

thinking of moving to Colorado, along with Ricardo, because she was struggling financially living in Orange County.

"On March 24, Hernandez's vehicle was located at a Mission Viejo park after a woman who lived nearby reported to the police that a van had been parked at the park since March 18. Inside the van were an attaché case, two boxes of jewelry, two plastic gloves, and two plastic bottles of a liquid that smelled like gasoline.

"On March 25, defendant told Avila she was going to a job interview and would return. But defendant did not return and did not answer her phone when her daughter and Avila called her. The next day, defendant's daughter and Avila found a note in defendant's room stating that defendant had gone to Colorado to follow Ricardo.

"A wholesale jeweler who had sold Hernandez jewelry for five or six years gave police information about the type of jewelry Hernandez had purchased. He identified the pair of earrings that defendant's daughter had taken from the bag of jewelry as a pair Hernandez had bought.

"In December, defendant phoned her daughter and said she was living in Anaheim. The daughter asked defendant if she knew the police were looking for her. Defendant said she had taken Ricardo out of the country to a drug rehabilitation facility in Tijuana.

"The daughter met defendant at a park and asked defendant to come with her to the police station. Defendant said that a psychic had told her 'that she had a curse, that someone wanted to be with her no matter what and the person was not going to stop until he got what he wanted, which was being with her.' Defendant said she had told Ricardo what the psychic had said. Defendant said Ricardo had stabbed and murdered this man in self-defense (because the man had pulled a knife on him) and then "dumped his body in an alley blocks away from" defendant's home. Defendant said she was there and saw it happen. Defendant said the man had had only $5 in his pocket. She said she

4

had to take Ricardo out of the country. The daughter asked defendant to contact the police and to go away.

"The police asked defendant's daughter to phone Ricardo and record the conversation. The daughter did so on February 10, 2006.

"In February 2006, the daughter was shopping at a grocery store when she saw defendant giving out food samples. The daughter started crying and said, 'How could you be here knowing that the police is looking for you, knowing what you've done?' Defendant asked her to stop crying. The daughter said she had spoken with Ricardo and knew what had happened. She said that Ricardo had said defendant 'was involved with the murder of this man.' Defendant said she liked her job and was sorry she would have to look for another one. The daughter phoned the police.

"In March 2006, a homicide detective interviewed defendant. Defendant said, 'A mother will do for her child many things.' She said Ricardo had a drug problem that had caused her to lose many things, such as a vehicle, and that she had shed many tears for him. After the police had come to defendant's home in March 2005, Ricardo had panicked and fled because he had an arrest warrant. A week later, he had phoned her and said he was in Tijuana. She had driven his car to Tijuana and met him in a hotel room where he was coming down from drugs. Ricardo had confessed to murdering Hernandez. Ricardo told defendant that on the morning of her appointment with Hernandez, Ricardo had jumped into Hernandez's vehicle upon Hernandez's arrival. Ricardo told Hernandez, 'If you're looking for my mother, . . . she's not home.' Hernandez did not like Ricardo's tone of voice and the two men argued. Hernandez pulled out a knife. Ricardo disarmed Hernandez and stabbed him. The next day Ricardo disposed of the body.

"Defendant offered conflicting stories about what Ricardo did with the van and the body. She admitted she was there when the vehicle was abandoned, but later said she never saw the vehicle. She initially said Ricardo phoned her and needed a ride from

5

Garden Grove, then later changed her story to say she gave him a ride from Mission Viejo. When the detective said the bloodhound had picked up defendant's scent at the park where the vehicle was located, defendant replied the man was not there and the body was not there.

"Defendant said she owned the jewelry she asked her daughter to hold. Defendant said that any gloves found in the van belonged to her, because she used them for work. She said she was familiar with the Mission Viejo area because she cleaned houses there.

"Defendant said she had known Hernandez for about two or three years. She said he was a kind man with heart problems and she felt sorry for him and often cooked for him.

"Defendant said she had gone to see a psychic or tarot card reader because she was having headaches, backaches, and bad luck (such as recently losing her job). The card reader said a short elderly man with dark skin 'was suffocating her and prohibiting her from succeeding in life.' The card reader advised defendant to take some remedies and pray using candles. The detective accused defendant of asking Ricardo to murder Hernandez 'because of the spell that Hernandez had supposedly put on her . . . .' Defendant did not deny the accusation and did not seem bothered by it.

"Defendant said she helped pay for Ricardo to fly to Cuernavaca, Mexico, where his father lived.

"At some point, defendant's daughter phoned her father (who lives in Mexico) and found out her brother, Ricardo, was at the father's home.

"Ricardo was arrested in 2008 and a buccal swab was taken from him for DNA comparison. Ricardo's DNA profile (a profile estimated to occur in less than one in one trillion persons) was a major contributor match with DNA found in the glove in Hernandez's van." (*People v. Nivarez*, *supra*, G045230.)

6

*Court Proceedings*

In 2009, the prosecution charged Nivarez with first degree murder and second degree robbery. Following a seven-day trial, the jury found Nivarez guilty as charged. The trial court imposed a sentence of 25 years to life for the murder charge and stayed the sentence on the robbery charge. (§ 654.)

In 2020, Nivarez filed a petition seeking to vacate the murder conviction and to be resentenced. (§ 1172.6.) The prosecution filed a response, conceding that Nivarez met the statutory prima facie burden for relief.[5]

In 2022, the trial court conducted a hearing, in which the court relied on evidence "entirely from the trial transcript itself. None was offered by either party at the hearing. Nivarez did not testify on behalf of the petition or at the trial." The court denied the petition in a written ruling, which read, in part, as follows:

"The trial transcript constitutes the evidence which the court must use to determine whether there is proof beyond a reasonable doubt that the petitioner is guilty of murder . . . . This decision must be independent of the jury verdict.

"Both the analysis and the facts are straight forward. Here [based on] the circumstantial evidence (with only one reasonable inference which follows) combined with prodigious evidence of the petitioner's consciousness of guilt, the court finds beyond a reasonable doubt that the people have proved solely by the trial transcript that the petitioner is guilty of first-degree murder of the victim as an aider and abettor (why would they rob him and leave him alive?)[.] Clearly she set up the victim at a time and place for the son to kill him thereby aiding the actual taking of the victim's life. There is ample evidence of planning (the appointment, the gloves, the fencing of the jewelry), the murder and an aftermath, rich-in-loot but poor in execution and planning."

---

[5] The jury had been "instructed on the following theories of murder: aiding and abetting, an uncharged conspiracy to rob that had as a natural and probable consequence the crime of murder, first-degree murder and felony murder (robbery)."

II

DISCUSSION

Nivarez argues that the trial court's finding that she aided and abetted Hernandez's murder is not supported by substantial evidence. We disagree.

In this discussion we will: A) state the standard of review; B) consider relevant principles of law; and C) analyze the facts as applied to the relevant law.

*A. Standard of Review*

At an evidentiary hearing on a section 1172.6 petition, the trial court's task is to determine whether the prosecution has proven beyond a reasonable doubt that the petitioner is guilty of murder or attempted murder under current law. (§ 1172.6, subd. (d)(3).) We review the trial court's findings of fact for substantial evidence. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412.)

This familiar standard of review requires us to "'"'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.'"' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finders' findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

"We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could

8

reasonably deduce from the evidence.'" (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

"'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

### B. Relevant Principles of Law

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) "Murder may be of the first or second degree. While both require malice aforethought, first degree murder requires willful, deliberate premeditation." (*In re C.R.* (2008) 168 Cal.App.4th 1387, 1393.)

"A person who aids and abets the commission of a crime is culpable as a principal in that crime." (*People v. Gentile* (2020) 10 Cal.5th 830, 843.) "In general, to establish liability for murder under the theory of direct aiding and abetting, 'the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.'" (*People v. Curiel* (2023) 15 Cal.5th 433, 466.)

"Except for strict liability offenses, every crime has two components: (1) an act or omission, sometimes called the actus reus; and (2) a necessary mental state,

9

sometimes called the mens rea. [Citations.] This principle applies to aiding and abetting liability as well as direct liability. An aider and abettor must do something *and* have a certain mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

"As we have explained, 'an aider and abettor's guilt "is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state."'" (*People v. Valdez* (2012) 55 Cal.4th 82, 146.) "Establishing aider and abettor liability 'requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.'" (*Ibid.*)

### C. Analysis and Application

"Generally, there are three categories of evidence sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method." (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.) "These factors need not be present in any particular combination to find substantial evidence . . . . [ Citation.] However, '[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.' [Citation.] In conducting this analysis, we draw all reasonable inferences necessary to support the judgment." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

Here, as far as planning, there was evidence that on the morning of his death, Hernandez carried all of the jewelry he had in his safe, which was not his usual pattern, according to his granddaughter. Hernandez went to meet Nivarez at her home, where she lived with her son Ricardo. Based on this evidence, it is reasonable to infer that Hernandez carried more jewelry than usual at the request of Nivarez. Hernandez's van was then later found at a park near Nivarez's home. When police searched the van, they did not find Hernandez's body. However, the police found bottles of liquid smelling

10

of gas, and rubber gloves containing Ricardo's DNA. By 3:30 p.m. that same day, Nivarez was pawning the jewelry that had belonged to Hernandez, which was valued at $2,500. Viewed in the light most favorable to the verdict, this evidence taken together further supports an inference that Nivarez and her son had planned Hernandez's robbery and eventual murder (to conceal the robbery).

As far as motive, there was evidence Nivarez had recently lost her job, providing a financial incentive for the robbery of the jewelry. There was also evidence that Nivarez had a superstitious belief that Hernandez was causing her bad luck. That is, during a police interview, Nivarez claimed that a psychic had told her that a short elderly man with a dark skin tone "was doing this harm to her." When police confronted Nivarez with an accusation that she had asked her son Ricardo to kill Hernandez because "the spell that Hernandez had supposedly put on her," the detective said that Nivarez "didn't deny my accusation or seem bothered by it." (See *People v. Preston* (1973) 9 Cal.3d 308, 313–314 ["If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence . . . , and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt"].)

Although at one point Nivarez told the police that Ricardo killed Hernandez in self-defense after Hernandez pulled out a knife during an argument, the presence of a plastic glove containing Ricardo's DNA in Hernandez's van is circumstantial evidence that Ricardo's use of force against Hernandez was premeditated and deliberate. In other words, it is simply not credible to believe that Ricardo put on a glove at the moment the alleged need for self-defense arose. (See *People v. Edwards* (1992) 8 Cal.App.4th 1092, 1102 ["pretrial false statements by a defendant may be admitted to support an inference of consciousness of guilt by the defendant"].)

11

As far as the method of carrying out the murder, Nivarez made numerous inculpatory statements, including a particularly damaging statement made to her daughter that Nivarez was present when Herandez was killed. Nivarez also gave her daughter a bag containing $4,000 worth of jewelry a day after Hernandez had been discovered missing and asked her daughter not to tell anyone about it. Moreover, when the daughter called Nivarez and asked if she was involved in Hernandez's murder, Nivarez "said not to call her and ask for anything about this missing person because she believed her phone was tapped and the police [were] listening to the conversation."

In sum, there were no witnesses who testified that they saw Nivarez and her son Ricardo robbing and killing the victim. Indeed, Hernandez's body has yet to be found. But we find there is overwhelming circumstantial evidence in the record supporting Nivarez's guilt as an aider and abettor in the premeditated and deliberate murder of Hernandez. (See *People v. Manson* (1977) 71 Cal.App.3d 1, 42 ["The fact that a murderer may successfully dispose of the body of the victim does not entitle him to an acquittal. That is one form of success for which society has no reward. Production of the body is not a condition precedent to the prosecution for murder"].)

Thus, we affirm the order of the trial court, which denied Nivarez's section 1172.6 petition following an evidentiary hearing.

Nivarez argues the Supreme Court case of *People v. Morris* (1988) 46 Cal.3d 1 (*Morris*) compels a different result. We disagree.

In *Morris*, the defendant shot and killed a victim who was found nude in a bathhouse. (*Morris*, *supra*, 46 Cal.3d at pp. 19–20.) In a death penalty trial, a jury found true a robbery-murder special circumstance allegation, but there was no evidence that victim had any personal items in his possession before he was shot. (*Id*. at p. 20.) There were no witnesses who saw the defendant shoot the victim or the events leading up to the shooting. (*Ibid*.) The prosecution presented no evidence of motive to explain why the defendant killed the victim. To prove the murder was committed during the course of a

12

robbery, the prosecution relied solely on evidence that a few days after the murder, someone who looked like the defendant used a credit card that had been loaned to the victim before he was murdered. (*Ibid.*)

In reversing the robbery-murder special circumstance finding (but not the first degree murder conviction), the Supreme Court concluded there was no evidence "from which the jury could reasonably infer that [the] defendant deprived the victim of personal property in his possession by means of force or fear. The evidence merely shows that the assailant shot the victim, who was nude, and shortly thereafter a man who resembled the assailant was observed running from the scene to a waiting car." (*Morris*, *supra*, 46 Cal.3d at p. 20.) There also was no evidence suggesting when the defendant took the credit card that had been loaned to the victim. (*Id*. at p. 21.) In the court's view, it would be "impossible to make a reasonable inference from these facts that the taking occurred either before or during the shooting." (*Id*. at p. 20.)

Unlike *Morris*, in this case there was evidence Nivarez premeditated the murder. As we have summarized, Nivarez set up an appointment with Hernandez concerning jewelry. There is no dispute that Nivarez knew that Hernandez regularly carried jewelry with him. And distinct from *Morris*, there was evidence of motive. The evidence indicated Nivarez was financially stressed, and she had a personal motive to kill Hernandez based on her discussions with a psychic. Further, Nivarez's statement that Ricardo killed Hernandez in self-defense inside of the van cannot be reasonably reconciled with the discovery of a glove with Ricardo's DNA inside the van. Moreover, the jewelry that Nivarez pawned immediately after Hernandez was reported missing, and the jewelry Nivarez gave to her daughter the following day, were both circumstantially proven to be in Hernandez's immediate presence at the time he was killed.

Finally, Nivarez also argues: "Any inference that Nivarez intended to aid the killing of Hernandez is, at the very best, based on speculation." We disagree. As the trial court indicated, had Hernandez been allowed to live he would have had no difficulty

13

identifying the perpetrators, particularly Nivarez: "why would they rob him and leave him alive?" Thus, the trial court reasonably concluded based on all of the evidence: "Clearly [Nivarez] set up the victim at a time and place for the son to kill him thereby aiding the actual taking of the victim's life."

## III

## DISPOSITION

We affirm the order of the trial court, which was a denial of Nivarez's section 1172.6 petition.[6]

MOORE, ACTING P. J.

WE CONCUR:

MOTOIKE, J.

GOODING, J.

---

[6] Given our analysis of Nivarez's aiding and abetting liability, we need not address the Attorney General's alternative argument regarding a finding that Nivarez was a major participant in the robbery who acted with reckless indifference to human life.

14