Filed 6/17/24  P. v. Williams CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARK WILLIAMS,<br><br>    Defendant and Appellant. | H050739<br>(Santa Cruz County<br>Super. Ct. No. 22CR02540) |

Defendant Mark Williams is a disabled, retired engineer living in the Santa Cruz mountains.  In June 2022, after a confrontation with a person parked on a public road near his home, Williams was charged with assault with a deadly weapon, exhibiting a deadly weapon, making criminal threats, and resisting an officer.[*]  A jury found Williams guilty of all counts, and he was placed on two years formal probation.

On appeal, Williams challenges his conviction for making criminal threats on the ground that the trial court erred in refusing to instruct the jury on self-defense on that charge.  For the reasons explained below, we disagree and affirm.

---

[*] Specifically, Williams was charged with four counts:  (1) assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1); (2) criminal threats in violation of Penal Code section 422; (3) exhibiting a deadly weapon in violation of Penal Code section 417, subdivision (a)(1); (4) resisting a peace officer in violation of Penal Code section 148, subdivision (a)(1).  Subsequent undesignated statutory references are to the Penal Code.

# I. BACKGROUND

## A. The Evidence Presented at Trial

### 1. The Prosecution Case

On June 16, 2022, Armando Huerta was working for a tree-trimming company in the Santa Cruz mountains. Around noon, after completing a job, he parked his truck on a road under an oak tree, where he could get cell service, and ate his lunch.

Williams, who lived near the spot where Huerta parked, approached and asked Huerta what he was doing. When Huerta responded that he was taking his lunch hour, Williams said he was suspicious because there had been robberies in the neighborhood and told Huerta he had guns in his house.

Huerta stayed in his truck and worked on invoices, sent e-mails, and made phone calls. About 45 minutes later, Williams returned. This time Williams was angry, he yelled at Huerta and told him he needed to leave, and he called Huerta a child molester and a pervert. Huerta was shocked because he had not seen any children while he was parked. Huerta also was afraid because Williams yelled loud enough that the neighbors could hear these accusations, and Huerta worried that if he left and Williams called the police, it would look like he was guilty and had fled the scene. Huerta therefore stayed in his truck and continued working.

Another 30 minutes later, Williams returned, holding a metal shovel like a spear and pointing it at Huerta. Williams shouted that Huerta had to leave and again called Huerta a pervert and a molester. Huerta responded that he was working and was not doing anything wrong. Williams then told Huerta to drop his phone because "this was the last time [Huerta] was going to breathe," and Williams tried to hit Huerta in the face with the shovel. After hitting the truck with the shovel, striking the tires, the back of the truck, and some containers in the truck bed, Williams walked back to his house screaming. At the house, Williams called 911 to report a suspected child molester and told the dispatcher that he had threatened the suspected molester with a shovel.

2

Yet another 30 minutes later, Williams returned with a weed whacker powered on. Williams thrust the weed whacker's spinning end toward Huerta's face. Huerta put up his left arm to block the weed whacker, which hit his arm, leaving marks on his skin. Williams told Huerta to go or "he would take [Huerta's] eyes out." After Williams returned to his house, Huerta called 911, and Williams did the same. Deputies from the Santa Cruz County Sheriff's Office were dispatched. Because Huerta had mentioned that Williams had a gun, the first deputy to arrive conducted a pat search of Williams, and in doing so he noticed that Williams smelled of alcohol. Deputies who arrived later also found that Williams smelled strongly of alcohol, and he was angry and combative towards them. When one deputy held Williams's hands behind his back and said he would be put in handcuffs if he did not calm down, Williams responded that "I wouldn't want to hurt you," which the deputy interpreted as a threat. Williams later refused to walk to a patrol car, and three officers were forced to carry him to the car.

2. The Defense Case

Williams testified on his own behalf. He told the jury that he had a history of back problems and was forced to retire early because of severe pain from spinal injuries. Williams also testified that his son, daughter-in-law and their two children live about a quarter-mile from his house, and he often babysat his grandchildren.

Williams further testified that around June of 2017 some people started an illegal marijuana-growing operation across the street from his house and later became involved in distributing fentanyl and methamphetamine as well as trafficking humans. When the Sheriff's Department failed to respond satisfactorily to his complaints, Williams began watching the property across the street, photographing visitors, and writing down license plates, which led to him being reported for harassment and sheriff's deputies threatening to arrest him. In late 2017, there were two explosions across the street, and when the Sheriff's Department did not appear interested in investigating the explosions, Williams came to believe that the department was helping the drug operators. Williams also

3

testified that one time three men exited a car and pointed guns at him. Although shortly after this the drug operation shut down, Williams later saw people associated with the drug operation parked where Huerta eventually parked his car, which was a commonly used spot. However, by June 2022, Williams had not seen anyone from the drug operation for a year.

On June 16, 2022, the day he encountered Huerta, Williams's grandson came to visit. At around 10:00 or 10:30 a.m., when he walked his grandson down the driveway after his visit, Williams noticed Huerta's truck. Williams noticed the truck again around noon and thought it unusual that the vehicle was still there. Williams also thought he might have seen Huerta hold his phone up to take a picture of or speak to his grandson as the grandson headed home earlier that morning. As a result, Williams began to wonder if Huerta was a pedophile.

Williams then went to Huerta and asked if he needed help. Huerta responded with profanity and told Williams to mind his own business. This irritated Williams, so he called the police. Williams also testified that he saw Huerta hold his phone up every time there was a child around and that Huerta appeared to speak to some children two or three times. Williams went back to Huerta again, this time carrying a shovel, which he held between their two faces but did not hit Huerta with the shovel or threaten him.

Williams called the police once again and waited. An hour went by, and Huerta was still parked, using his phone. Williams began to worry that Huerta was a decoy, there to distract him from someone else. After loading a weapon and looking around his property for someone else, Williams went back to Huerta with a weed whacker "to try to scare the shit out of the man and get him out of here." Williams held the weed whacker in his right hand and took a video with a phone in his other hand. Williams asked Huerta what he was still doing there, and Huerta responded that Williams was trying to kill him. Huerta then tried to knock the cell phone out of Williams's hand, which may have caused the weed whacker to hit Huerta. Afterwards, Williams told Huerta he could have been

4

blinded. Finally, Williams backed up and started yelling in an attempt to get the attention of his neighbors. Williams returned to his house, unloaded his shotgun, and called the police.

When the deputies arrived, Williams admittedly "[w]ent insane" because of his negative past experiences with the Sheriff's Department. He was angry that they patted him down, and it was "extraordinarily painful" when they handcuffed him because it pinched his nerves.

Williams acknowledged that he had been drinking that day, but testified that he was not drunk. Williams also admitted that he never saw Huerta get out of his truck or that Huerta had a weapon.

### B. The Self-Defense Instructions

During trial, Williams requested an instruction on self-defense to the charge of criminal threats. Both parties supplied the court with unpublished cases discussing the applicability of a self-defense theory to the charge, but neither cited any published authority. The trial court declined to give the instruction, concluding that self-defense does not apply to criminal threats. The court also noted that there had been "no evidence from Mr. Williams yet that there was any sort [of] imminent threat."

The trial court instructed the jury that self-defense was a defense to the assault charge (count 1) as well as the lesser-included offense of simple assault, and to the brandishing charge (count 3), which the prosecutor told the jury concerned Williams's use of the shovel. The court did not give a self-defense instruction on the criminal threat charge, which the prosecutor told the jury concerned Williams's threat to take out Huerta's eyes with the weed whacker.

The jury convicted Williams on all counts. After sentencing in January 2023, Williams filed a timely notice of appeal.

## II. DISCUSSION

Williams argues that the trial court erred in refusing to give the jury a self-defense instruction concerning the charge of criminal threats in violation of section 422. Independently reviewing the trial court's refusal to give the instruction (see, e.g., *People v. Sisuphan* (2010) 181 Cal.App.4th 800, 806), we conclude that the instruction was unwarranted because Williams's self-defense theory was not supported by substantial evidence.

In criminal cases, trial courts have an affirmative duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 73.) This duty extends to defenses if they are supported by substantial evidence and not inconsistent with the defendant's theory of the case. (*Ibid*.; *People v. Townsel* (2016) 63 Cal.4th 25, 58.) However, a trial court may refuse to give an instruction on a defense if the record lacks substantial evidence supporting its application. (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386.) " 'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt." ' " (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)

Neither party cites any published authority addressing whether self-defense is a valid defense against a charge of making criminal threats in violation of section 422. Williams contends that self-defense applies to the criminal threats charge because courts have approved self-defense instructions concerning possession of a firearm by a felon and exhibiting a firearm in a threatening manner, and those offenses are analogous to the offense of making criminal threats. (See *People v. King* (1978) 22 Cal.3d 12 [trial court erred in denying self-defense instruction to charge of felon in possession of concealed firearm under section 12022]; *People v. Kirk* (1986) 192 Cal.App.3d. Supp. 15 [trial court erred in refusing self-defense instruction for charge of drawing a weapon in a threatening

6

manner in violation of section 417].) We need not decide whether those offenses are analogous or whether a self-defense is a valid defense against a criminal threats charge because, even assuming that it is, a self-defense instruction was unwarranted here because the record lacks substantial evidence supporting the defense.

To justify an act as self-defense, a defendant "must have an honest *and reasonable* belief that bodily injury is about to be inflicted upon him." (*People v. Goins* (1991) 228 Cal.App.3d 511, 516, italics in original.) To qualify as reasonable, a belief that bodily injury is about to be inflicted must be objectively reasonable, with reasonableness evaluated from the point of view of a reasonable person in the position of the defendant. (*People v. Horn* (2021) 63 Cal.App.5th 672, 683.) In addition, the fear must be of imminent harm. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm— will not suffice." (*In re Christian S.* (1994) 7 Cal.4th 768, 783 (*Christian S.*).)

The record in this case lacked substantial evidence of an objectively reasonable fear of imminent bodily injury. Williams was not able to describe anything that he observed suggesting that Huerta was likely to inflict bodily injury upon him. To the contrary, Williams testified Huerta parked in a spot that was regularly used by the public, that Huerta never left his truck, and that he did not see Huerta with a weapon. In addition, although Williams had several interactions with Huerta, beyond some anger and profanity, Williams was unable to describe any aggressive or violent conduct suggesting that Huerta posed an imminent danger, much less a danger that justified Williams approaching Huerta with a weed whacker and threatening to take his eyes out. Furthermore, to the extent that Williams perceived a connection with the drug operation formerly in the area and worried that Huerta might have been acting as a decoy, his fears lacked an objective basis, especially in light of Williams's admission that he had not seen any alleged drug activity on his street in the year preceding his encounter with Huerta.

7

(See *People v. Perez* (1970) 12 Cal.App.3d 232, 236 ["[t]he right to have a jury instructed on self-defense must be based upon more than imagined facts or inferences"].)

Indeed, throughout his encounters with Huerta, Williams was the aggressor. It is well-settled that self-defense may not be asserted by a defendant who, "through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1; see also *People v. Watie* (2002) 100 Cal.App.4th 866, 877 [the justification for self-defense requires both that defendant was in fear of his life or serious bodily injury and that " 'the conduct of the other party was such as to produce that state of mind in a reasonable person' "].)

Nor was Williams entitled to an instruction on defense of another. Although Williams testified that Huerta may have spoken to Williams's grandson and other children as well as tried to take pictures of them, there was no evidence that Huerta posed an imminent danger to Williams's grandson or any other child when Williams threatened him with the weed whacker. (See *People v. Michaels* (2002) 28 Cal.4th 486, 530-531 [defendant not entitled to defense of others instruction because at the time defendant killed the victim, the person allegedly in danger of harm was detained and the murder victim was asleep at home].) Indeed, there was no evidence that Williams's grandchild or any other child was anywhere near Huerta when Williams threated him.

Williams asserts that a self-defense or defense of others instruction was warranted on the criminal threats charge because the trial court determined that the evidence supported such an instruction on the assault and brandishing charges. In fact, nothing in the record suggests that the court found that substantial evidence supported the self-defense instruction on these counts, and absent such a finding the trial court's decision to give self-defense instructions on those counts does not compel the conclusion that there was substantial evidence supporting an instruction on the criminal threats charge. Instead, Williams may not have been entitled to a self-defense instruction on any charges.

8

### III. DISPOSITION

The judgment is affirmed.

_____

BROMBERG, J.

WE CONCUR:

_____

GROVER, ACTING P.J.

_____

LIE, J.

*People v. Williams*
H050739